LEWIS v. STATE.

Opinion delivered November 17, 1913.

GAME AND FISH—RIGHT TO HUNT AND FISH LIMITED TO RESIDENTS OF
CERTAIN COUNTIES—INVALIDITY OF STATUTE.—Act 280, Acts of 1913,
p. 1118, prohibiting nonresidents from hunting and fishing in
Grant, Hot Spring and Lonoke counties, without a license, is in-

valid, because no license is required of residents of those counties, and the act confers a special privilege upon the residents of the counties, and denies the same to the other residents of the State, which it is beyond the power of the Legislature to do.

Appeal from Grant Circuit Court; *W. H. Evans*, Judge; reversed.

*Baldy Vinson*, for appellant.

The act is unconstitutional and void. Art. 2, § 18, Const. 1874; *Id.*, art. 2, § 29; 111 Ill. 581; 53 Am. Rep. 643; vol. 1, Green's History of the English People, 252, 253; 152 U. S. 133; 123 Tenn. 654, 135 S. W. 325.

*Wm. L. Moose*, Attorney General, and *Jno. P. Streepey*, Assistant, for appellee.

Error is confessed because the act grants privileges to citizens of Grant County greater than those conferred upon citizens of other counties of the State; and because the act is unconstitutional in that it makes a classification based entirely upon mere residence. 5 Pac. 927; 5 Conn. 391-397; 38 L. R. A. 561; 26 L. R. A. (N. S.) 794-798.

WOOD, J. This appeal involves the validity of Act 280 of the General Assembly of 1913, page 1118, approved March 29, 1913, prohibiting nonresidents from hunting and fishing in Grant, Hot Spring and Lonoke counties without a license, prescribing a penalty for the violation of the act in a sum not less than ten nor more than fifty dollars. The act does not require citizens of those counties to obtain license before hunting and fishing in the counties named or in other portions of the State.

Our Constitution provides that "the General Assembly shall not grant to any citizen or class of citizens privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Const. of Ark., art. 2, § 18.

The act in question confers upon the citizens of the counties named privileges and immunities not granted to

other citizens upon the same terms. No reason is given in the act why citizens of the above counties should be classified into a favored territory having privileges not enjoyed by other citizens upon the same terms. The classification is based upon residence only, and without further being shown on the face of the act, it must be held as arbitrary and unjustly discriminative as to citizens of the State outside of the territory mentioned.

In *State* v. *Mallory,* 73 Ark. 236, the court had under review the act approved April 24, 1903, making it unlawful for any person who is a nonresident of the State of Arkansas to hunt or fish in the State at any season of the year. We held under that act that nonresidents of the State who owned land within the State could hunt and fish on their own lands during the open season. But the act, of course, as to nonresidents of the State who are not owners of land within the State, is still in force, and they are prohibited from hunting and fishing at any season of the year. That act involves a discrimination in favor of residents of the State as against nonresidents who are not owners of land in the State. Such discrimination is a valid exercise of governmental power which the sovereign State has over the fish and game, *ferae naturae,* within its borders to protect and preserve same for the benefit of its inhabitants. *McCready* v. *Virginia,* 94 U. S. 391. See also *Geer* v. *State of Connecticut,* 161 U. S. 519. But the statute now under consideration involves a discrimination in favor of the residents of certain territory in the State against the people of the State residing outside of such territory.

The fish and game of the State, *ferae naturae,* belong to the whole people of the State collectively. The right which the individual has to take fish and game on his own premises by virtue of his ownership in the soil on which they may be found, as was said in *State* v. *Mallory,* 73 Ark. 236-248, "is not an unqualified and absolute right, but is bounded by this limitation, that it must always yield to the State's ownership and title held for

the purpose of regulation and preservation for the public use." See also *Organ* v. *State,* 56 Ark. 267.

When it becomes necessary for the propagation and preservation of wild game and fish for the use of the public, the people, acting in their sovereign capacity, through their law-making power, may pass laws to regulate the right of each individual which he enjoys in common with every other member of the community to the use of same. But when the sovereign undertakes to regulate or restrain the individual in his right as a member of the community to enjoy the right to take and use this common property of all it must do so upon the same terms to all members of the community alike.

The common right, which one individual of the whole community is entitled to enjoy as much as another, can not be made by law the exclusive privilege of the people of a certain class or section upon terms and conditions that do not apply to the whole people alike. This right which one individual has in common with every other individual in the community to take and use fish and game, *ferae naturae,* is one that has existed from the remotest times, and, although at one time in England after the Norman conquest the right to take fish and game was claimed as a royal prerogative to the exclusion of the people, it was restored to them by the Barons at Runnymede in 1215, and was declared in the great charter which they wrested from King John. "The rights," says Green, "which the barons claimed for themselves they claimed for the nation at large." Green's History of the English People, vol. 4, pp. 252-4.* These rights

---

* "In words which almost close the charter, the community of the whole land is recognized as the great body from which the restraining power of the baronage takes its validity. There is no distinction of blood or class, Norman or not Norman, of noble or not noble. All are recognized as Englishmen, the rights of all are owned as English rights. Bishops and nobles secured at Runnymede the rights not of baron and churchman only, but those of freeholder and merchant, of townsman and villein. The provisions against wrong and extortion which the barons drew up as against the king for themserves, they drew up as against themselves for their tenants." Green's History of the English People, Vol. 1, page 252.

were confirmed and established ever thereafter in England by acts of Parliament, and they have come down to us from the laws of England and may be regarded as a common heritage of the English speaking people. See *Parker* v. *People,* 111 Ill. 581, 53 Am. Rep. 643. Also *Geer* v. *Conn.,* 161 U. S. 519; *Martin* v. *Waddell,* 16 Peters, 412.

The only justification for a law regulating and restricting the common right of individuals to take wild game and fish is the necessity for protecting same from extinction and thus to preserve and perpetuate to the individual members of the community the inalienable rights which they have had from time immemorial. While the State, holding the title to game and fish, so to speak, in trust for every individual member of the community, may pass laws to regulate the rights of each individual in the manner of taking and using the common property, yet, as we have already stated, this must be done, under the Constitution, upon the same terms to all the people. No special privileges or immunities can be conferred. Where the necessity for the preservation of the wild game and fish exists in certain territories of the State, that territory may be segregated for the purpose of regulating the right to taking game and fish therein, but the privilege of taking and using same must be extended to the people of the State outside of the territory upon the same terms that are given to those who are residents of the territory embraced in the legislation. *Hays* v. *Territory,* 5 Pac. 927.

In the cases of *State* v. *Higgins,* 38 L. R. A. 561 (South Carolina), and *Harper* v. *Galloway,* 26 L. R. A. (N. S.) 794 (U. S.), the question here involved was considered and determined in accord with the doctrine we have announced.

It follows that the law under consideration is invalid. The confession of error of the Attorney General is well taken. The judgment is therefore reversed and the cause is dismissed.