Shellnut *v.* Arkansas State.Game & Fish Commission.

4-9994                                    258 S. W. 2d 570

Opinion delivered April 20, 1953.

Rehearing denied June 22, 1953.

*Donald S. Martz* and *Joe W. McCoy,* for appellant.

*Ed E. Ashbaugh,* for appellee.

ED. F. McFADDIN, Justice. The question here presented is the power of the appellee, Arkansas State Game & Fish Commission, to enforce its "Special Regulation" of October 23, 1950, insofar as affects the lands of these appellants.

### Background Facts.

The Arkansas General Assembly of 1927 enacted Act No. 95, which, by its caption, provided for "the establishment and operation of Game and Fish Refuges. . . ."[1] This Act (hereinafter called the "1927 Act") authorized the establishment of a Game and Fish Refuge under certain circumstances, when requested by owners of at least 640 acres. Section 2 of the 1927 Act provided that the landowners so consenting to the establishment of the Refuge would surrender all rights to regulate hunting on said lands, and that such agreement, signed by the landowners, would continue in force for an uninterrupted period of not less than five years. Section 7 of the 1927 Act gave the Commission authority to provide rules and regulations governing such Refuge, and made any violation of the regulations to be punishable as a misdemeanor.

In 1930, the Game & Fish Commission (hereinafter called "Commission")[2] duly established a Game Refuge of several thousand acres in Grant County. Even though the Refuge was stocked with deer, other wild life was also protected. The lands owned by the appellants herein (being 21 tracts and totalling approximately 858 acres) were not a part of the Game Refuge proper, but were lands leased to the Game Refuge for a 10-year term,

---

[1] The 1943 General Assembly adopted Act No. 146 "to codify the existing game and fish laws that apply to the State as a whole;" and Sec. 15 of the said 1943 Act contains the provisions of Act No. 95 of 1927. Sec. 15 of Act No. 146 of 1943 is found in § 47-701 Ark. Stats.

[2] Act No. 133 of 1917 created the "State Game and Fish Commission." In the 1927 Act, the name was "State Game and Fish Commission." In Constitutional Amendment No. 35, the name is "Arkansas State Game and Fish Commission." We disregard the difference in names, and merely say "The Commission."

under the provisions of § 2 of the 1927 Act. These leases were renewed in 1940 for another 10-year term. But in 1950 when the leases expired, these appellants refused to again lease their lands to the Commission for Refuge purposes.

In the meantime, the Commission had, on April 15, 1931, under the authority of § 7 of the 1927 Act, promulgated certain rules and regulations governing lands in, or leased to, a Game Refuge, and these rules are hereinafter referred to as the "1931 rules." [3] In 1950 when the appellant landowners refused to renew the leases of their lands to the Game Refuge, the Commission ascertained that appellants' lands were entirely surrounded by lands that were a part of the Game Refuge; and the Commission then adopted its "Special Regulation" of October 23, 1950, here at issue, and which reads:

"All lands located within the boundaries of a State Game Refuge that are completely surrounded by other lands on which petition and agreement have been presented to the Commission for establishment of said State Game Refuge, and approved by the Commission, shall be and are hereby closed to all types of hunting. The same regulations shall apply to said lands as set up in rules and regulations approved April 15, 1931, under authority of Act 95 of the 1927 Acts of the General Assembly."

[3] Sec. 1 of these rules reads: "There shall be no hunting or carrying of firearms on a state game refuge except as provided in these rules and regulations, and the hunting, shooting, killing, trapping, injuring or taking of any game bird, game animal or song or insectivorous bird, or the destroying or disturbing of the nests or eggs of any game or song or insectivorous bird, is prohibited."

Sec. 4 reads: "Minks, skunks, opossum, fox or rabbits, caught in the act of destroying crops, poultry or livestock, may be killed at any time by persons living within the game refuges, provided such killing is reported to a keeper of the refuge, and the unskinned carcass of such animal is turned over to such keeper, and rabbits may be trapped or killed in any garden or orchard which bears evidence of injury by such animals."

Sec. 5 reads: "Permits in writing may be secured from the Game and Fish Commission by those owning lands and living within game refuges authorizing the trapping of all classes of vermin thereon at such times and in the manner prescribed by the Commission."

## This Case.

On November 9, 1950, the appellants filed in the Pulaski Chancery Court this present suit against the Commission,[4] setting forth the background facts substantially as heretofore detailed, and alleging that the said "Special Regulation" of October 23, 1950, was violative of Art. 2, § 22, of the Arkansas Constitution. The prayer of the complaint was that the Commission be enjoined from enforcing its said regulation of October 23, 1950, insofar as concerned the lands of these appellants.

The cause was heard on January 3, 1952, on oral testimony, which developed, *inter alia*, that some of the appellants' lands involved in this suit were used for home and farm purposes; that because of the 1950 "Special Regulation" and the 1931 rules, such parties were unable to protect their gardens, crops, and orchards from destruction by marauding deer;[5] that as a result, the use of the lands was restricted, and the value of the lands was materially reduced; that one of the appellants, Shellnut, had tried without success to get the Commission to satisfy his claims while his lands were under lease; and that the failure of the Commission to do so was a factor in the refusal of such landowner to renew his lease at its expiration in 1950.

The Chancery Court denied the appellant landowners any relief, and they have appealed. We hold that the landowners are entitled to relief.

Even though Constitutional Amendment No. 35 gives broad powers to the Commission, nevertheless, the Commission is subservient to, and bound by, Art. 2, § 22 of the Constitution, which reads:

". . . private property shall not be taken, appropriated or damaged for public use, without just compensation therefor."

---

[4] Originally the Executive Secretary of the Commission was sole defendant. Later the Commission was made a party.

[5] It is informative to note the success of this State Game Refuge Legislation. It is stated in the briefs that in 1930, a conservative estimate was that there were less than 500 deer in the entire State of Arkansas; that through this system of Game Refuges, beginning with the 1927 Act, the deer population in Arkansas has been increased to an excess of 75,000.

It is not necessary that the property should be completely taken in order to bring the case within the protection of this Constitutional guaranty.[6] It is only necessary that there be such serious interruption of the common and necessary use of the property as to interfere with the rights of the owner. See *Pumpelly* v. *Green Bay Co.*, 13 Wall. (80 U. S.) 166, 20 L. Ed. 557.

The effect of the Commission's ''Special Regulation'' of 1950 was to seriously restrict the appellants' use of their lands, and was, therefore, violative of the quoted Constitutional provision. Under the 1927 Act, the Commission had the right to enforce its 1931 rules on lands within the Game Refuge, or on lands of owners who had leased their lands to the Game Refuge. When in 1950 the appellant landowners refused to renew their leases to the Game Refuge, then the Commission's attempt to enforce its 1931 rules on the appellants' lands constituted a damaging of private property for public use, within the Constitutional inhibition hereinbefore quoted.

If the Commission considered the appellants' land to be necessary for the Game Refuge, then the Commission could have proceeded by eminent domain to acquire the plaintiffs' lands, or an easement thereon.[7] Nothing in the case of *Hampton* v. *Arkansas State Game & Fish Comm.*, 218 Ark. 757, 238 S. W. 2d 950, prevents the Commission from exercising eminent domain when the purpose of the taking is the *protection* of wild life, rather than its *destruction,* which latter was the situation in the Hampton case. In the case at bar, the Game Refuge is for the preservation of wild life. In the Hampton case,

[6] Under this Constitutional guaranty, we have held that dumping sewage into a stream and polluting the waters thereof was a damage to a lower riparian owner, and such owner was entitled to recover damages, under the quoted Constitutional provisions. See *McLaughlin* v. *Hope,* 107 Ark. 442, 155 S. W. 910, 47 L. R. A., N. S. 137. Again, we held that the pollution of the air over private property by offensive odors escaping from a sewer tank, was a damage to adjacent residential property, within the quoted Constitutional provision. See *Sewer Dist.* v. *Fiscus,* 128 Ark. 250, 193 S. W. 521, L. R. A. 1917D, 682.

[7] Sec. 8 of Amendment No. 35 says in part: "Said Commission shall have the power to acquire by purchase, gifts, *eminent domain,* or otherwise, all property necessary, useful, or convenient for the use of the Commission in the exercise of any of its duties . . ." (Italics our own.)

the proposed activity was the killing of wild life. The Commission's "Special Regulation" of 1950 was an attempt to impose an easement or servitude on the appellants' lands, without the consent of the landowners, and without complying with the eminent domain provisions of our Constitution. In short, under the facts here shown, the Commission was damaging the appellants' property without due compensation, and, therefore, the 1950 "Special Regulation" was violative of Art. 2, § 22 of the Constitution, insofar as the rights of the appellant landowners were concerned.

In this Court, the Commission argues that under Constitutional Amendment No. 35, the Commission has the authority to "divide the State into zones";[8] and that the "Special Regulation" of 1950 is valid under such authority. We find it unnecessary to discuss the zoning power of the Commission, because it is self evident that the Commission's "Special Regulation" of 1950 was not a zoning plan,[9] but was a plan for a perpetual easement or servitude, and was violative of the Constitutional provision previously quoted.

The Commission urges that the appellants have proceeded in the wrong forum: that is, the Commission says that the appellants should have proceeded at law instead of in equity. The appellants counter with the answer that their remedy at law was inadequate and incomplete. The facts show that the Commission made its "Special Regulation" of 1950 without notice to these landowners;

---

[8] Sec. 8 of Amendment No. 35 reads in part: "The Commission shall have the exclusive power and authority to issue licenses and permits, . . . , *and shall have the authority to divide the State into zones,* and regulate seasons and manner of taking game, and fish, and furbearing animals therein, and fix penalties for violations. *No rule or regulation shall apply to less than a complete zone,* except temporarily in case of extreme emergency." (Italics our own.)

[9] The Commission's witness, L. G. Polk, testified, *inter alia*:

"Q.  Your testimony is then, the state has not been zoned, has it?

A.  No, sir, not specifically, no sir."

and again:

"Q.  The commission has never seen fit to call it a zone by resolution?

A.  Not by name.

Q.  Or number?

A.  No sir."

and that they did not learn of this regulation until the Commission proceeded to attempt to enforce it against the appellants and their lands. The appellants then immediately filed this suit and obtained a temporary injunction, which remained in force until shortly before the trial of this cause.

The rule is that equity does not act when the remedy at law is adequate and complete; but here, there is evidence that gardens, orchards, and crops could have been hopelessly and permanently destroyed, except for the injunction granted by the equity court. When a State Agency acts illegally, it is subject to be restrained by suit in equity. *Federal Compress Co.* v. *Call,* 221 Ark. 537, 254 S. W. 2d 319. In *Jenson* v. *Radio Co.,* 208 Ark. 517, 186 S. W. 2d 931, we said:

"The general rule of equity jurisdiction in suits to restrain acts of public officers is stated in 28 Am. Jur. 356, as follows: 'There is no doubt but that equity will exercise jurisdiction to restrain acts or threatened acts of public corporations or of public officers, boards, or commissions which are *ultra vires* and beyond the scope of their authority, outside their jurisdiction, unlawful or without authority, or which constitute a violation of their official duty, whenever the execution of such acts would cause irreparable injury to, or destroy rights and privileges of, the complainant, which are cognizable in equity, and for the protection of which he would have no adequate remedy at law. An injunction to prevent an officer from doing that which he has no legal right to do is not an interference with his discretion.'

"This court held in the case of *Rowland* v. *Saline River Railroad Company,* 119 Ark. 239, 177 S. W. 896, that injunction is the proper remedy to curb the abuse of power of the railroad commission in the issuance of an arbitrary and unreasonable order. Injunction will issue to prevent a public official from unlawfully assuming power over property in such manner as to infringe upon or violate the rights of a citizen. *Noble* v. *Union River Logging Railroad Company,* 147 U. S. 165, 13 S. Ct. 271, 37 L. Ed. 123."

Without laboring the point, we conclude that equity had jurisdiction to restrain the Commission from the enforcement of its 1950 "Special Regulation," insofar as concerned the lands of these appellants, since the order was—under the facts here shown—violative of Art. 2, § 22 of the Constitution. The decree is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

The CHIEF JUSTICE and Justices HOLT and ROBINSON dissent.

## ON REHEARING

GEORGE ROSE SMITH, J., on rehearing. In its petition for rehearing the appellee construes our opinion to mean that every landowner has the right to hunt upon his own property the year around and that the Commission can curtail that right only by condemning the fee simple title to the land. It was not our intention to lay down such a rule, nor do we think our opinion susceptible of that construction.

It must be remembered that Act 95 of 1927 contemplates voluntary action on the part of the landowners. Under that Act the owners of not less than 640 acres may request the Commission to declare their lands a game refuge. Quite evidently the landowners could establish a refuge without the Commission's assistance were it not for the settled American rule that it is not a trespass for anyone to hunt upon unenclosed wild lands. *Bizzell* v. *Booker*, 16 Ark. 308. One of the effects of Act 95 is to permit landowners desiring a game preserve to avoid the effect of this common law principle by asking the Commission to declare hunting upon their lands to be unlawful.

In 1930 a 30,000-acre refuge was established by voluntary action under Act 95. The Commission approved this sanctuary with the knowledge that its leases would expire in ten years, and in 1940 the leases were renewed upon that same understanding. In 1950, however, the appellants refused to continue the refuge for another ten years, and the Commission adopted its Special Regulation, which had the effect of subjecting the

appellants' property to the same restrictions that would have been imposed had they leased their lands to the Commission for another ten years.

We adhere to the view expressed in our original opinion, that such action on the part of the Commission is in effect the condemnation of the appellants' hunting privileges, for which compensation must be made. Of course, the State has the power to regulate the taking of game, but in doing so it cannot arbitrarily discriminate among its landowners. *Lewis* v. *State,* 110 Ark. 204, 161 S. W. 154. For example, a nonresident owner of land in Arkansas cannot be prohibited, by reason of his non-residence, from hunting upon his own land if a resident landowner would have that privilege in the same circumstances. *State* v. *Mallory,* 73 Ark. 236, 83 S. W. 955, 67 L. R. A. 773. Here, the Commission's attempt to compel the appellants to submit to restrictions that are to be voluntarily assumed under the statute is *prima facie* an arbitrary action, so that the Commission has the burden of demonstrating the validity of its conduct.

The Commission presents a twofold argument in its effort to uphold its Special Regulation. First, it is said that the appellants' refusal to lease their lands created an emergency, which may be met by special regulations as provided by the sixth paragraph of § 8 of Amendment 35. But the trouble is that this particular regulation is not an emergency measure; by its terms it will continue in force as long as the surrounding area constitutes a game refuge. A different question might be presented had the Commission temporarily prohibited hunting pending the institution of an action for the condemnation of the hunting rights of the appellants.

Second, it is said that the entire 30,000-acre sanctuary constitutes a zone, so that the Commission may issue hunting regulations under the above paragraph of the amendment. But, as we pointed out in the first opinion, this Special Regulation does not purport to be a zoning plan. It applies only to lands surrounded by an existing refuge and might therefore affect tracts of only a few acres.

Nevertheless the Commission argues that the Special Regulation, when considered together with the voluntary leases by other landowners, has the practical effect of establishing a 30,000-acre zone. Had the Commission undertaken to adopt a uniform regulation applying alike to all lands within the area no doubt there would be a presumption in favor of the validity of its action, casting upon the aggrieved landowner the burden of showing that no zone is involved. But the Commission has not so acted, and we think it has the burden of proving its contention. The amendment itself does not define the word zone. To say the least, a zone must be of sufficient size to bear a reasonable relationship to the purpose for which the zone is declared to exist. If, for example, the zoning regulation is intended to further the propagation of deer, the constitution clearly means that the restricted area must be large enough for the accomplishment of that purpose. In the trial court the Commission offered no proof on this particular point; so we have no evidence on which to sustain the argument now advanced.

Rehearing denied.

ROBINSON, Justice, dissenting. Amendment No. 35 to the Constitution gives the Game & Fish Commission authority to establish zones and regulate the seasons and the taking of game and fish therein. Under this amendment the Commission should be allowed to zone any area of the State and prohibit hunting in such zone, provided it does not act in an arbitrary manner.

It can not be said the Commission acted arbitrarily in this instance. The area in which an attempt is being made to protect the wild game consists of over 30,000 acres which has been used as a game refuge for more than a decade. Appellants own only a small portion thereof. As a result of such protection, the wild life, especially deer, have become numerous. In this refuge the Commission has in effect established a zone where no hunting is allowed.

If the Commission can not zone this particular thirty odd thousand acres as a refuge, just where can zones

be established to protect the game? The establishment of refugees has caused the deer population of this state to multiply by the thousands; now, instead of the area involved here being a refuge inuring to the benefit of the whole state, it will be a slaughter pen to be operated by a few who will enjoy it.

I respectfully dissent.

The Chief Justice and Mr. Justice Holt concur in this dissent.