## ARKANSAS STATE GAME AND FISH
## COMMISSION et al *v.* A. F. STANLEY et al

75-272                                  538 S.W. 2d 533

### Opinion delivered July 12, 1976

*William H. Donham,* for appellants.

*McMath, Leatherman & Woods,* for appellees.

JOHN A. FOGLEMAN, Justice. The Arkansas State Game and Fish Commission acquired some 34,000 acres of land in Arkansas and Jefferson Counties, beginning in 1948. It is known and designated as the Bayou Meto Wildlife Management Area. At the time of acquisition nearly all of the merchantable timber had been recently removed, but since that time no timber has been cut from these lands. In 1973, the Commission decided to initiate a program of "harvesting" of timber on these lands. Pursuant to the plan evolved, the Commission entered into a contract on October 18, 1973, with Alvin Yarbrough, for the cutting and removal of certain timber from a 640 acre tract constituting a part of an area of 2,080 acres designated as Compartment 2B, one of

numerous such compartments in the overall plan of the Commission. On July 17, 1974, suit was filed by appellees (citizens, taxpayers and hunters) as a class action, to enjoin the Commission, its members and director and the timber contractor from cutting and removing timber under the contract. Appellees alleged that, if the contract was performed, the area involved would be destroyed as a wildlife and waterfowl habitat, and contended that the proposed action by the Commission was ultra vires, arbitrary, capricious, unreasonable and unlawful. A decree was entered on April 1, 1975, enjoining appellants from carrying out the particular timber cutting operation. This appeal comes from that decree, which was based upon the chancery court's holding that the contract was ultra vires and that the Commission had acted arbitrarily, capriciously, unreasonably and unlawfully in entering into it, and that the making of this particular contract was an abuse of discretion. We disagree and reverse.

The parties are not in agreement about the scope of judicial review of actions of the Arkansas State Game and Fish Commission, which is not only an administrative agency with constitutional status but the repository of certain powers of government enumerated in Amendment 35 to the Arkansas Constitution by which it was created. As we view the matter, we need not resolve all the differences between the parties as to the powers of the Commission or the scope of judicial review. If the act was ultra vires, there is no question about the power of equity courts to restrain it. *Arkansas State Game & Fish Comm'n* v. *Eubank,* 256 Ark. 930, 512 S.W. 2d 540; *Shellnut* v. *Arkansas State Game & Fish Comm'n,* 222 Ark. 25, 258 S.W. 2d 570. If the Commission's action is not ultra vires and was not arbitrary or capricious, unreasonable or wantonly injurious, in bad faith, or an abuse of its discretion, then the injunction must be dissolved. *Arkansas State Game & Fish Comm'n* v. *Eubank,* supra; *Farris* v. *Arkansas State Game & Fish Comm'n,* 228 Ark. 776, 310 S.W. 2d 231; *Shellnut* v. *Arkansas State Game & Fish Comm'n,* supra. The matter of unreasonableness is not directed at the question of the wisdom of the action, which we take to be outside the scope of judicial review. The Game and Fish Commission's actions are certainly not to be judged solely on the basis of their wisdom or the lack of it any more than the actions of a city council or another administrative agency. See *Patterson* v. *U.S.,* 178 F. Supp. 771 (D.C. Ark.

1959); *Haynie* v. *City of Little Rock,* 243 Ark. 86, 418 S.W. 2d 633; Am. Jur. 2d 558, Administrative Bodies and Procedure, § 207. To do so would be to impermissibly substitute the judgment of the courts for that of the agency. *Hall* v. *Bledsoe,* 126 Ark. 125, 189 S.W. 1041. See also, *City of Batesville* v. *Grace,* 259 Ark. 493, 534 S.W. 2d 224.

It was alleged and shown that this contract was the first entered into in the implementation of a plan to cut some of the merchantable timber on practically all of the Bayou Meto Wildlife Area. The contract provided for the sale of mixed hardwoods marked by Commission agents and employees with blue and yellow paint. It authorized the erection of mills, camps, roads and other improvements necessary in the logging and manufacturing of the timber sold in locations approved in advance by representatives of the Commission and required removal of the contractor's structures, tools and equipment prior to the expiration of the contract. There were restrictions on the manner of utilization of the trees cut, the height of stumps and a provision for triple damages for unnecessary damage to unmarked trees, witness trees, monument and timber reproduction, to be determined by the Commission's local officer in charge, who could also require cutting of unmarked trees unavoidably damaged and the payment of current market value therefor.

The chancellor not only found that the Commission's actions were ultra vires and capricious and arbitrary but that they were violative of the limitations on its powers set forth in *Farris* and contrary to the interest of the public. These general conclusions are apparently based upon the specific fact finding of the chancellor, which was as follows:

> Without detailing the evidence, it is clearly apparent that the intensity of the timber cut proposed would effectively destroy the particular 640-acre tract as a refuge for ducks. At the present time, ducks come into this area to feed on acorns, and other food. To destroy the trees to the extent set forth in the proposed cut would drastically reduce the number of ducks using the area. The evidence reflects that ducks often roost at night in open water; but during the day they fly to

wooded areas, such as this 640-acre tract. They feed there, and return to their roosting area at night. It is also to be noted that this tract would be used by ducks as a refuge even more extensively if the Commission could devise a means for flooding the tract for more of the Winter period when ducks are in this area. But the evidence also clearly reflects that the present situation as to water is far better from the standpoint of ducks than would be the case if the proposed timber cut is made.

It goes almost without saying that if the proposed cut is made, it will be many years before the tract is restored to its present state with respect to "cover." That is the principal reason why the danger is so important for this Court to realize. Unlike the situation in *Eubank,* supra, the ill effects will last far longer than a few days. In fact, the damage done might well be permanent, insofar as the duck population in the Bayou Meto Refuge is concerned.

Although we have emphasized the importance of providing a refuge for ducks in Bayou Meto, this wildlife management area is inhabited by other wildlife, and several witnesses testified on this point. The evidence reflects that the proposed cut would damage the refuge from the standpoint of this other wildlife.

On trial de novo, we find that the preponderance of the evidence shows that the contract was not ultra vires and that the Commission's action was not arbitrary or capricious, or an abuse of its discretion.

In considering the question of the powers of the Commission, we must first view Constitutional Amendment 35, which, of course, is an act of the ultimate sovereign, the people of Arkansas, and is subject only to constitutional, not legislative or judicial, limitations. See *Smith* v. *McNair,* 231 Ark. 49, 328 S.W. 2d 262; *Arkanaas State Game & Fish Comm'n* v. *Edgmon,* 218 Ark. 207, 235 S.W. 2d 554; *Farris* v. *Arkansas State Game & Fish Comm'n,* 228 Ark. 776, 310 S.W. 2d 231; *Shellnut* v. *Arkansas State Game & Fish Comm'n,* supra. Pertinent provisions are:

The control, management, restoration, conservation and regulation of birds, fish, game· and wildlife resources of the State, including hatcheries, sanctuaries, refuges, reservations and all property now owned, or used for said purposes and the acquisition and establishment of same, the administration of the laws now and/or hereafter pertaining thereto, shall be vested in a Commission to be known as the Arkansas State Game and Fish Commission, to consist of eight members. ***

Commissioners shall have knowledge of and interest in wildlife conservation. ***

*****

The fees, monies, or funds arising from all sources by the operation and transaction of the said Commission and from the application and administration of the laws and regulations pertaining to birds, game, fish and wildlife resources of the State and the sale or property used for said purposes shall be expended by the Commission for the control, management, restoration, conservation and regulation of the birds, fish, and wildlife resources of the State, ***

*****

Said Commission shall have the power to acquire by purchase, gifts, eminent domain, or otherwise, all property necessary, useful or convenient for the use of the Commission in the exercise of any of its duties, ***

Judicial interpretation of these powers has been rather limited, but this court has, on occasion, been called upon to review various actions and has commented upon the extent of, and limits on, the constitutional grant. We have held that the Commission has a very broad discretion in determining how wildlife shall be conserved. *W. R. Wrape Stave Co.* v. *Arkansas State Game & Fish Comm'n,* 215 Ark. 229, 219 S.W. 2d 948; *Hampton* v. *Arkansas State Game & Fish Comm'n,* 218 Ark. 757, 238 S.W. 2d 950. In *Wrape,* we said that the Amendment is complete within itself and that it was intended by the Amendment to either provide or leave to the Commission,

methods for attaining the ends enumerated. See also, *State* v. *Casey*, 225 Ark. 149, 279 S.W. 2d 819. We have said that the powers of the Commission are broad. *Arkansas State Game & Fish Comm'n* v. *Hornaday*, 219 Ark. 184, 242 S.W. 2d 342; *State* v. *Casey*, supra.

Even though the issues were not related to the particular subject before us, the language of this court in treating rules and regulations adopted by the Commission are equally applicable to any other discretionary power vested in the Commission by the amendment. In *Casey*, we said:

> \*\*\* Under these provisions of the amendment we hold that the Commission has been given full and complete administrative power and authority to promulgate rules and regulations necessary for the conservation and preservation of all wildlife including not only the power to establish a bag limit, set seasons in which to hunt and fish and the penalty for violations but also the power to levy a license fee on all hunting dogs, just so long as such license fees are not unreasonable or arbitrary and are for regulatory purposes — as appears here — and not for revenue. \*\*\*

In *Farris*, we said:

> \*\*\* A majority of this court has determined that the Game and Fish Commission as opposed to the Legislature, is vested with the power to make such rules and regulations as is deemed necessary to protect and conserve the wildlife resources of the state. In the exercise of its police power the Commission has determined that it should prohibit the sale of game fish from private impoundments of water. The Commission has a wide discretion within which it may determine what the public interest demands, and what measures are necessary to secure and promote such requirements. The only limitation upon this power to formulate these rules and regulations, which tend to promote the protection and conservation of the wild life resources of the state, and which tend to promote the health, peace, morals, education, good order and welfare of the public is that the rules and regulations must reasonably tend to

correct some evil, and promote some interest of the commonwealth, not violative of any direct or positive mandate of the constitution. **❞ The Commission, as trustee for the people of this state, has the responsibility and is charged with the duty to take whatever steps it deems necessary to promote the interest of the Game and Fish Conservation Program of this state; subject only to constitutional provisions against discrimination, and to any valid exercise of authority under the provisions of the Federal Constitution. ***

It is also important that we have in view the purposes of the Commission in acquiring and maintaining the area involved. The records of the Commission during the acquisition period revealed that the original approach was made by the initiation of an investigation of possible acquisition of a wildlife management area in the vicinity of Stuttgart, followed by authorization of the activation of a plan for establishing a wildlife management area on Bayou Meto embracing about 7,000 acres of the land now owned. The minutes of the Commission recorded the approval of the Bayou Meto Land Acquisition as a Federal Aid Wildlife Restoration project by the United States Fish & Wildlife Service. They also recited that waterfowl, deer, squirrel, furbearing animals and turkey population were to be there protected and managed to provide maximum restoration and utilization and that other use to be made of the land was timber management. There was testimony that Regional Federal Aid documents disclosed that the land was acquired as a wildlife management area, not as a public duck shooting area, in spite of the fact that a former secretary of the Commission had described it as a public shooting ground for ducks when he testified in *Hampton v. Arkansas State Game & Fish Comm'n,* supra.

Testimony of James Talley, Forester for the Game and Fish Commission, indicated that the contract on the 640 acres was only the first step in a cutting cycle designed for both timber and game management on the entire tract. At a rate of 640 to 1,200 acres per year, according to a letter from Talley introduced in evidence, several years would elapse before all the timberlands were reached.

W. D. Gaines, Biologist for the Arkansas State Game & Fish Commission, compiled a habitat analysis for the Commission on Compartment 2B, which was outlined in the Commission's wildlife forestry management plan for the Bayou Meto Wildlife Management Area. He had written a rough draft of the analysis in the summer and fall of 1973, but did not have it in the form exhibited in evidence prior to the execution of the timber contract. Gaines had a college degree in biology and additional hours of credit in forestry. He had previously been employed by U.S. Gypsum Company, a private timber company, for whom he formulated wildlife management plans for some 100,000 acres in Arkansas, Louisiana, Tennessee and Mississippi along the Mississippi River. He had been employed by the Commission for approximately five years, of which he had spent at least three and one-half years in carrying out direct management on 80,-000 acres of Commission land as District Wildlife Biologist.

In making his analysis, Gaines made field inspections of the area, both before and after the marking of trees to be cut on the 640-acre tract. He found little of the compartment in an artificial green tree reservoir, and only a small portion of the 640 acres flooded or used by migratory waterfowl. This area could not be counted on as a duck reservoir but it could be developed into a green tree reservoir if it were encompassed by a levee and deep wells and pumps were installed. In considering multi-species management, he found Compartment 2B capable of supporting 50 to 60 per cent of the wildlife it had a potential for supporting. In his analysis he attributed this to general stagnation and unproductivity of the overstory mast producing timber species which should afford, in a cyclic manner, hardwood mast in sufficient quantities to act as a supplemental food supply during late fall and winter and to the absence of sufficient ground growing food and cover. He explained the desired procedure as follows:

> The best overall feasible management technique that could and should be employed in this forest is a general thinning of the growing stock to provide a release to over-burdened trees providing additional sunlight to the crowns, to provide small openings or holes in the forest creating the growth of grass, weeds, and reproduction of the forest species that will aid both

in a renewable vigorous and sustained long range equilibrium of the forest as a whole and provide in the brush areas needed food and cover for most forest game animals.

Gaines found a population of one white-tailed deer for each 40 to 50 acres in the tract. He described this as extremely low for a bottomland hardwood area. This he attributed to the lack of available browse and cover because of the overstory canopy and general deterioration of the forest. Hindering factors which caused a low fall turkey population were lack of nesting cover, bugging grounds, escape cover from predators, spring and summer plants producing berries, fruit and seeds, and winter grasses and buds necessary to supplement overstory mast production. He found the compartment unsuitable for migratory or wintering waterfowl without development for flooding. He stated that a hardwood forest managed for waterfowl should provide a vigorous, healthy stand of older classes of trees, well spaced to promote the maximum amount of mast production, and interspersed with small openings containing grass, weeds, and other plants to provide food for ducks when the overstory trees did not produce. The best overall management for squirrels, according to his analysis, was to create a forest condition that has a large percentage of healthy, well-spaced trees 30 to 100 years old. From a long range point of view, scientific forest game management plans through removal or thinning of standing trees to prevent stagnation and deterioration of a mature forest would be advantageous for squirrels in spite of a short term adverse effect on the population. Gaines' analysis as to rabbits was that population increased quickly in newly thinned areas that provided cover as well as food from plants that grow in newly created openings. Gaines reported that forest removal as a wildlife management technique is widely accepted by professional wildlife managers throughout the nation as the only practical means for large scale wildlife management, in spite of severe attack from a portion of the public not directly involved in wildlife management, whose viewpoint he described as naive. Gaines said that fencing a temporary forest and keeping out fires would doom it to extinction. He stated his opinion that there was a necessity for diversification in publicly owned wildlife areas to fulfill the needs of the present and future population

of Arkansas on a multi-species basis, i.e., deer, squirrels, turkeys, ducks. According to Gaines, different forest management practices would be utilized in other compartments, because of differing situations.

The testimony of Gaines had very strong support from that of Dr. Leslie L. Glasgow, a consultant employed by appellants after this suit was filed and described by appellees as possessed not only of an impressive academic record but of some experience in managing wildlife habitats, at least on an advisory basis. Dr. Glargow, a teacher of forestry and wildlife at Louisiana State University holds a bachelor's degree in forestry, a master's degree in wildlife conservation, a doctor's degree in wildlife management and enough hours for a master's degree in zoology. He had been Director of the Louisiana Wildlife and Fisheries Commission, an Assistant Secretary of the United States Department of the Interior, administering the National Parks Bureau, the United States Fish & Wildlife Service, the Bureau of Marine Resources and the Bureau of Commercial Fisheries, Waterfowl Biologist for both Louisiana and Indiana, and a wildlife consultant since 1952, mostly in the development of wildlife management plans for private individuals, state and federal governments, generally in wet lands. Dr. Glasgow is also a duck hunter and has written on related subjects for publication. He had visited the area three times between 1956 and the time he testified. He spent three and one-half hours on the ground inspecting Compartment 2B after viewing it from the air, just a month before he testified. He observed the markings on the trees made for carrying out the contract involved. He found little lesser vegetation on the forest floor.

Dr. Glasgow said that an unmanaged wilderness would not produce a sustained habitat for an optimum wildlife population that is adapted to the area, but would develop into a few old trees that dominate the site, so that the number of suitable areas for wildlife, with the exception of squirrels, decreases, as will the wildlife. He said that it was difficult to manage wildlife, but that wildlife responds to management of the habitat, and that the most practical and commonly used method is to manipulate the timber stand by use of a selective removal of trees or groups of trees, as in the Commission's plan, to provide diversity in the stand, to permit development

of other food producers such as annual weeds and other ground vegetation, to stimulate reproduction of desirable species of trees, rather than undesirable hardwoods which are shade tolerant, and to stimulate food production on remaining trees by their increased exposure to sunlight. He found that Compartment 2 B, in its existing condition, was not a good habitat for either waterfowl or other wildlife, because the vigorous trees that were dominant had been previously removed, leaving only cull species which were undesirable from a wildlife standpoint. From his examination of the Commission's plan, he found it to be a step in the right direction toward development of an adequately diversified wildlife habitat and felt that the luxury of managing an area for a single purpose rather than for multiple species of game could no longer be afforded. Dr. Glasgow testified that the selective removal plan would improve the waterfowl habitat without question and would not destroy waterfowl coming into Arkansas and staying in the Bayou Meto Management Area.

James Talley, the Game & Fish Commission Forester, had been previously employed by the Arkansas Forestry Commission as Fire Control Assistant and Associate Forester. In the latter position he had formulated all the programs of the Arkansas Forestry Commission. He was instrumental in marking the compartmental selection for forest management of the Bayou Meto Wildlife Management Area. He said that both single tree and group selection methods had been used in Compartment 2 B, the former to remove broken, overmature, diseased and undesirable trees and the latter to let sunlight hit the forest floor for the benefit of the young tree generation in order to produce more desirable trees as well as mushrooms, berries, seeds, browse, insects and grubs for wildlife food. The area was marked under his supervision and direction.

Carl Hunter, a farm manager possessed of a degree in agriculture, with a major in biology had served as a wildlife biologist for appellants for 13 or 14 years ending in 1957. He observed that a large mature open forest which produces heavy mast crops most years produces large concentrations of waterfowl. He had gone over the area in question and estimated that 50 per cent of the timber would be cut. This he said would deteriorate the wildlife habitat, would only benefit

deer, would be detrimental to some degree to other types of wildlife and would afford hardships to duck hunters through ruts left by machinery and by reason of treetops and underbrush resulting from the cutting. Potential hardships on hunters were emphasized by other witnesses.

Wayne Hampton, who served on the Game and Fish Commission from August 1960, until April 1962, visited the area and found that, on a half-acre sample there were 17 trees, 10 of which, all acorn bearing, were marked for cutting. He thought the Commission plan would destroy the Bayou Meto Area as a duck habitat. A county surveyor testified that the proposed timber cut was heavy and erratic. A sawmill operator testified that cutting operations would result in damaging 20 per cent of the remaining trees.

A number of witnesses, whose only qualification was that they were duck hunters, were permitted, in spite of appellants' objections, to give opinion evidence, because, according to the chancellor, all duck hunters consider themselves experts. We can accord little weight to this testimony. There were those who had cut timber, or had seen timber removed, from lands and found that a habitat for ducks had been destroyed to the detriment of duck hunting. Some had found that deer hunting had not been affected and that in certain areas squirrel, coon, and turkey could be hunted. Some of these joined in the opinion that, if the program were carried on, the area would be destroyed as a duck habitat. Most of the testimony on behalf of appellees was directed toward the effect of the plan on duck hunting in the wildlife area and in the general vicinity. Many were concerned with the number of mast producing and den trees marked for cutting. In determining the questions presented here, we must remember that the Commission's duties and its right to determine how they are to be performed, i.e., how wildlife is to be conserved, are not to be measured by mere doubt-creating suggestions. *W. R. Wrape Stave Co. v. Arkansas State Game & Fish Comm'n,* supra.

The strongest evidence favoring appellees was a publication entitled "Disappearing Wetlands in Eastern Arkansas" written by Trusten Holder, who had retired in 1969 after 29 years' service with the Game & Fish Commission and who is

considered an authority on the subject on which he wrote. Gaines disagreed with some of Holder's statements. Holder was not available for cross-examination. His publication contains the following statement:

> Contrary to popular opinion an area does not have to be managed. In fact, most of the real benefits to wildlife and to the general public can be received just by buying a wooded tract and keeping it from being cleared.

Dr. Glasgow specifically expressed his disagreement with this statement in spite of his great respect for the author. This witness stated that selective cutting and followup of wildlife stand improvement was an accepted and approved practice in many areas of the United States.

When we view the whole record, it seems clear to us that the action of the Game & Fish Commission was not ultra vires or unlawful. It was simply an exercise of discretion of that body in the "control, management, restoration, conservation . . . of . . . game and wildlife resources of the State, . . . sanctuaries, refuges, reservations . . . " It is also clear to us that the Commission has not acted arbitrarily and capriciously. To act arbitrarily means to act in a manner decisive but unreasoned, or arising from an unrestrained exercise of the will, caprice of personal preference, based on random or convenient selection or choice rather than on reason or nature and to act capriciously means to act without being guided by steady judgment or purpose. *City of Little Rock* v. *Parker,* 241 Ark. 381, 407 S.W. 2d 921; *City of North Little Rock* v. *Harble,* 239 Ark. 1007, 395 S.W. 2d 751. However unwise or inexpedient the Commission's decision may be or however wrong it may turn out to be, there is no evidence that it was unreasoned or without steady judgment or purpose. There may well be a difference of opinion about the propriety of the particular procedure adopted to accomplish the basic purposes of Amendment 35, but it certainly cannot be said that there is not respectable authority supportive of the approach being taken. In considering the matter we must remember that the Commission is composed of members having knowledge of and interest in wildlife conservation.

Nor can we say that the Commission abused its discre-

tion. Here again, we must defer to the knowledge and interest of the Commission and would have to say that there was no reasonable basis for their decision before we could say that there was an abuse. This we cannot do. It is urged that the Bayour Meto Wildlife Management Area was acquired and dedicated primarily, if not solely, for a duck refuge. There is clear evidence that, even at the beginning of the property acquisition, other purposes were contemplated, in spite of the testimony of the then executive secretary of the Commission, in *Hampton* v. *Arkansas State Game & Fish Comm'n,* supra, that the primary purpose for the acquisition was for duck hunting and shooting. Even if that were the case, there is nothing whatever to limit the discretion of the Commission to change the primary use of all or any part of the sanctuary or refuge or to devote the property to other uses, so long as they are within the scope of the purposes enumerated in Amendment 35. Decisions in this regard are policy matters vested entirely in the Commission, so long as it acts within limitations which have been imposed on the exercise of its powers. Evidence of abuse of this discretion should be so clear as to be virtually beyond argument before the courts should declare it so. The constitutional amendment left to the Commission the adoption of methods to reach the desired ends. In this respect we must also say that the Commission is substituted for the General Assembly in determining what is in the public interest in the matter of wildlife conservation. *Farris* v. *Arkansas State Game & Fish Comm'n,* supra. At least when the matter is debatable, it would be beyond our powers to substitute our judgment for theirs. See *City of Little Rock* v. *McKenzie,* 239 Ark. 9, 386 S.W. 2d 697.

The decree is reversed, the injunction dissolved and the case dismissed.

The Chief Justice and Justices HOLT and ROY dissent.

FRANK HOLT, Justice, dissenting. I must respectfully dissent. It is true that the Commission has broad discretion in matters concerning the conservation of wildlife. *Hampton* v. *Ark. State Game & Fish Comm.,* 218 Ark. 757, 238 S.W. 2d 950 (1951). However, it is well established that the power of the Commission is subject to judicial review and restraint by the

courts where, according to the evidence, it exceeds that power. *Shellnut v. Ark. State Game & Fish Comm.*, 222 Ark. 25, 258 S.W. 2d 570 (1953); *Ark. State Game & Fish Comm. v. Eubank and Johnson*, 256 Ark. 930, 512 S.W. 2d 540 (1974); and *Farris v. Ark. State Game & Fish Comm.*, 228 Ark. 776, 310 S.W. 2d 231 (1958).

In the case at bar it appears that the majority relies primarily upon the testimony of appellants' experts in determining that the chancellor's finding is against the preponderance of the evidence. The appellees also presented expert witnesses. Mr. Hunter, who had worked as a wildlife biologist for appellant for approximately 14 years, testified that since 1957 he has managed the Wing Mead Farms consisting of approximately 7,000 acres with about 2,000 of these acres in hardwood timber and duck reservoirs. There has been no cutting permitted in this area in at least 35 years and possibly 50 years. His management of the Wing Mead Farms has been so successful that Dr. Glasgow, one of appellants' principal witnesses, brought one of his wildlife classes from Louisiana State University on a field trip to observe the Wing Mead Farms. According to Mr. Hunter, an uncut forest produces large concentrations of water fowl. He had observed the area in question and testified that approximately 50% of the timber would be cut according to appellants' proposal. He further testified that, as a result of the proposed cut, "I think it would deteriorate the wildlife habitat." Appellants' selective cutting would be beneficial only to deer hunting and would be detrimental to other types of wildlife including duck hunting.

The appellees adduced as evidence a publication, "Disappearing Wetlands in Eastern Arkansas," written by Mr. Trusten Holder. Mr. Holder retired in 1969 after 29 years' service with the appellant Commission. He is an acknowledged expert and an authority on the subject of his article. In his publication he wrote:

> Contrary to popular opinion an area does not have to be managed. In fact, most of the real benefits to wildlife and to the general public can be received just by buying a wooded tract and keeping it from being cleared.

Wayne Hampton, a witness for the appellees, was of the view that the appellants' proposed cut would "ruin" the Bayou Meto area as a duck habitat. It is significant that he had once served as a commissioner on the appellant Commission. He is a longtime resident of the general area. According to him, it appeared that approximately one-half of the trees would be destroyed. Another witness, who is director of the American Duck Hunters Association, testified that he had seen the results of a similar cut on other areas managed by appellant Commission. He described the cut: "I would call it a total destruction of any duck woods that I have ever seen in my life. I was never so amazed as to what we were led to believe that had happened in this area."

The majority summarily rejects and accords little weight to the testimony of duck hunters, most of whom were local landowners or residents. Based upon many years of experience, they were knowledgeable about the results of appellants' proposed timber cutting. From their observation of the cutting and removing of timber, such as that proposed by appellants, it would be detrimental to and destroy the area as a duck habitat.

After review of all the evidence, I am unable to say that the chancellor's finding is clearly against the preponderance of the evidence and I would affirm.

HARRIS, C.J., and ROY, J., join in this dissent.