Charlie CHAFFIN, et al. *v.* ARKANSAS GAME AND FISH COMMISSION

88-80                                    757 S.W.2d 950

Supreme Court of Arkansas
Opinion delivered October 10, 1988

432

*Wilson, Engstrom, Corum & Dudley*, by: *Stephen Eng-strom*, for appellant.

*P. Douglas Mays*; and *Friday, Eldredge & Clark*, by: *Michael G. Thompson* and *Robert S. Shafer*, for appellee.

DARRELL HICKMAN, Justice. This case is a legal showdown between the Arkansas Game and Fish Commission and the Arkansas legislature. The issues raise fundamental questions about the powers of these respective bodies under the Arkansas Constitution, specifically Amendment 35 which created the Game and Fish Commission.

Three specific questions are before us. First is whether the legislature's restriction in an appropriation bill, limiting the amount of money the commission may spend on its magazine, violates the separation of powers doctrine and Amendment 35. We hold that it does and affirm the trial court's decision that § 14 of Act 939 of 1987 is unconstitutional.

The second question is whether the legislature or the Game and Fish Commission has the power to set the maximum amount of money that may be charged an Arkansas resident for the privilege of hunting and fishing in the state. The chancellor held that both the legislature and the commission can set fees for hunting and fishing. We hold that the legislature clearly has the power to set the maximum fees for resident hunting and fishing licenses under Amendment 35 and § 18 of Act 939 as amended by Act 1 is constitutional. In this regard we reverse the chancellor's decree.

The final question involves the Legislative Council's practice of reserving the power of "review and advice" in an appropriated bill. We hold this practice is a violation of the separation of powers doctrine and reverse the chancellor's ruling. Section 17 of Act 939 in that regard is unconstitutional.

## BACKGROUND AND FACTS

The suit began with the Game and Fish Commission suing the state treasurer, the state auditor and the director of the Department of Finance and Administration. The commission's complaint asked that enforcement of certain provisions of Act 939 of 1987 and Act 1 of the First Extraordinary Session of 1987 be enjoined. It also requested a declaration that parts of the acts contain unconstitutional restrictions on the commission's power. Six members of the general assembly, Senator Charlie Cole Chaffin, Representatives Mike Wilson, John Miller, Jody Mahoney, Ernest Cunningham and Bobby Newman, were permitted to intervene in their official capacities and as members of the Legislative Council, the Joint Budget Committee, taxpayers and licensed hunters and fishermen.

The evidence at the trial showed that the commission began publishing a magazine called "Arkansas Game & Fish" in 1967. No subscription fee is charged for the magazine and no advertising is permitted. According to George Purvis, former director of the commission's information and education division, the magazine is a valuable tool for wildlife management. He testified that an educated and informed public is essential to a successful program. His testimony was corroborated by the director of the Game and Fish Commission, Steve Wilson.

The commission had budgeted $720,000 to publish the magazine in 1987-1988. An audit commission, formed by the legislature, made a study of the Game and Fish Commission and reported to the legislature that too much money was being spent on the magazine. It was recommended that the commission either allow advertising or a subscription fee. The legislature acted by refusing to appropriate the money and limited expenditures to $450,000 in fiscal year 1988 and $150,000 in fiscal year 1989. A provision was inserted in the act allowing additional funds to be raised through advertising. But an absolute ceiling of $600,000 per year was placed on money spent on the magazine.

Representative Mike Wilson, a member of the Joint Budget Committee that examined the Game and Fish Commission's budget, testified that the legislature cut the magazine appropriation because other programs of the commission were more important; the legislature did not consider the magazine as

essential as other functions of the commission. He conceded the magazine was educational and education was important to wildlife management. But the most essential function of the Game and Fish Commission in his judgment was the regulation and management of game and fish laws and research.

Representative John Miller was chairman of the Legislative Council and chairman of the Joint Budget Committee at the time of this lawsuit. He testified that a commission created by the legislature conducted an audit of the Game and Fish Commission. The report made to the legislature recommended that less money be spent on the magazine so "there would be more money left to purchase land to make provisions for better quantity of game and fish for sportsmen of the state."

### THE GAME AND FISH MAGAZINE ISSUE

The commission argues that Amendment 35 created an independent constitutional agency with the full power of management and control of the state's wildlife resources and that the legislature has encroached on this right. The legislature argues that Amendment 35 gives it the power to appropriate money and with that power comes the right to decide whether an expenditure is necessary. Both sides readily concede that each has independent, separate powers that must be respected. The commission concedes that it cannot direct the legislature to appropriate money with unfettered discretion. The legislature recognizes that the power of appropriation cannot be used to render the commission unable to perform its "core" functions.

The legislators and the commission cite extreme examples of what could occur should either party abuse its power. The legislators ask what if the commission asks for money to erect a statue of a giant bull frog (a giant duck statue was suggested in oral argument). Is the legislature required to appropriate money? The commission asks what if the legislature "zeros out" the commission's budget requests and gives it nothing. We do not have these extremes before us. There are remedies available to prevent unreasonable and arbitrary acts by the commission, *Arkansas State Game and Fish Comm'n* v. *Stanley*, 260 Ark. 176, 538 S.W.2d 533 (1976), and, of course, we have the power to review legislative acts. We will not dwell upon "what if," but simply address the questions before us.

Section 14 of Act 939, which deals with the magazine appropriation and is under attack, reads:

> Expenditures for the Arkansas Game and Fish Commission magazine shall be limited to $450,000 in fiscal year 1988 and $150,000 in fiscal year 1989 from funds generated through the sale of licenses, permits and fees. Additional funds generated through the sale of advertisements may be used to supplement said funds, but in no event shall the Commission's total expenditures for the Game and Fish magazine exceed $600,000 per fiscal year.

In striking down this provision of Act 939, the chancellor stated:

> . . . [I]t is the Arkansas Game and Fish Commission which must decide how to spend this money to accomplish its designated functions. The magazine is one of the methods utilized by the Commission to accomplish those purposes. If the Commission cannot control the amount of money which is to be spent for its magazine from year to year, then it cannot control whether the magazine will be published at all. Such a result was not intended by Amendment 35 because it would transfer practical control over wildlife regulation and management to the General Assembly.

What power does the Game and Fish Commission have? Amendment 35, adopted in 1944, created the Game and Fish Commission as an independent constitutional agency with the clear power to control, manage, restore, conserve, and regulate the birds, fish, game and wildlife resources of the state. In a line of cases, we have held that the commission has broad discretion in carrying out this purpose. *Arkansas State Game and Fish Comm'n* v. *Stanley, supra; Farris* v. *Arkansas State Game and Fish Comm'n*, 228 Ark. 776, 310 S.W.2d 231 (1958); *W. R. Wrape Stave Co.* v. *Arkansas State Game and Fish Comm'n*, 215 Ark. 229, 219 S.W.2d 948 (1949).

In *Stanley* we had before us the question of whether the commission's decision to cut timber on one of its wildlife management areas was legal. The trial court held that the commission acted *ultra vires* (beyond the power), arbitrarily and unlawfully. We reversed the decree and upheld the commission's

actions. In doing so we said:

> Decisions in this regard are policy matters vested entirely in the Commission, so long as it acts within limitations which have been imposed on the exercise of its powers. Evidence of abuse of this discretion should be so clear as to be virtually beyond argument before the courts should declare it so. The constitutional amendment left to the Commission the adoption of methods to reach the desired ends. In this respect we must also say that the Commission is substituted for the General Assembly in determining what is in the public interest in the matter of wildlife conservation . . . . At least when the matter is debatable, it would be beyond our powers to substitute our judgment for theirs.

While Amendment 35 gives the legislature the power to appropriate, it does not give the legislature the power to manage the operations of the commission. *Arkansas Game & Fish Comm'n* v. *Edgmon*, 218 Ark. 207, 235 S.W.2d 554 (1951). Allocation of resources and establishment of priorities are the essence of management. The commission and the legislature differ on the importance of the magazine to the commission's function. The commission decided its education and information program is important—the legislature wants the money spent otherwise. In this case the legislature is attempting to assert its control over the commission's right to make policy decisions. By interfering with this right and power of the commission, the legislature exceeded its constitutional authority.

In *Board of Regents of Higher Education* v. *Judge*, 168 Mont. 433, 543 P.2d 1323 (1975), the question was whether certain line item restrictions in a university system appropriation bill infringed on the authority of the board, a constitutional body. The court found:

> [T]he legislature cannot do indirectly through the means of line item appropriations and conditions what is impermissible for it to do directly. Line item appropriations become constitutionally impermissible when the authority of the Regents to supervise, coordinate, manage and control the university system is infringed by legislative control over expenditures.

The appellants point out, however, that art. 5 § 31 of the Arkansas Constitution provides that no appropriation shall be made except for "defraying the necessary expenses of government" and the legislature has the exclusive right to determine what is necessary; in this case the legislature was merely deciding what was necessary. This particular argument was not made below, but we find no conflict between art. 5 § 31 and Amendment 35 in this case. The facts reflect that the legislature is attempting to substitute its judgment for that of the commission on a question of management of resources, something it cannot do. Art. 5 § 31 and Amendment 35 are not irreconcilable. Obviously, Amendment 35 gave the commission more power to act independently than other state agencies that are not independent constitutional agencies.

■ The appellants argue that the trial court erred in refusing to admit into evidence certain newspaper articles and documents along with the text of a constitutional amendment rejected by the voters in 1942. That was also a proposed amendment creating a Game and Fish Commission. In this case we find no abuse of discretion in the chancellor's decision disallowing introduction of this material on relevancy grounds.[1] *See Lovell* v. *Democratic Central Committee*, 230 Ark. 811, 327 S.W.2d 387 (1959).

## *RESIDENT HUNTING AND FISHING LICENSE FEES*

The second question addresses the conflict over who has the power to set the prices for hunting and fishing licenses and permits, and it is a complicated matter. But it can be reduced to a simple question: does the legislature have the power to set the maximum license fees for residents to hunt and fish? We hold it does.

When Amendment 35 was passed, the only special permits or fees besides the ordinary resident hunting and fishing licenses were those for hunting dogs and some commercial licenses. Since then a variety of tags, permits and licenses have been created by the commission. Permits for deer, trout stamps, duck stamps,

---

[1] The author would find the evidence admissible but reach the same result the majority does, that is, the interpretation of Amendment 35 would be the same.

special licenses or permits for turkey and bear and use of permits for hunting with bows and muskets have been authorized. According to Director Steve Wilson, at one time it would cost close to $60.00 to buy all the licenses, tags, and permits for resident hunting and fishing.

In 1984 the commission decided to create a sportsman's permit consolidating many of the licenses and permits into one document. In 1986 the permit cost $17.25. Those who wanted to hunt deer with conventional guns or hunt small game were only required to pay the $10.50 for a "Resident Hunting License." A major change occurred when the sportman's permit was issued for 1987. Deer hunters were required to purchase the permit and the price was increased to $25.00.

Under the 1987 plan, a $25.00 Sportman's Permit allowed a hunter to hunt all legal game except waterfowl which cost an additional $7.00. Resident fishing licenses remained at $10.50 except for a $5.00 trout permit. A Resident Combination Fishing/Hunting License & Sportsman's Permit cost $30.25.

This was the situation when the legislature passed Act 939 of 1987. (Contention between the legislature and the commission over the Commission's revenues is nothing new. In 1984 the commission launched an unsuccessful effort to have the legislature establish an excise tax for its benefit. That same year the commission's ⅛% sales tax proposal was defeated by the voters.) The purpose of § 18 of the act is to establish the maximum annual hunting and fishing license fees that could be charged by the Game and Fish Commission. The maximum cost for the ordinary resident hunting license or a resident fishing license is $10.50. Special licenses are permitted for bow or primitive weapon hunting, and for turkey, bear or large game. The maximum price of any of these special licenses is $7.25, with an absolute cap of $17.75 for the privilege of hunting under any of the above circumstances. The legislature also made it clear through the amendatory Act 1 that deer hunters need no special permit. They need only pay the $10.50 resident license fee.

Finally, the act provides that the maximum for any combination resident hunting/fishing license is $28.25; the maximum for a duck stamp is $5.50, and for a trout stamp, $5.00.

Roy Byrns, chief fiscal officer for the commission, testified at trial that several elements of the commission's licensing scheme do not comply with the act. The commission's $25.00 price for the sportsman's permit, its $30.25 for the combination license, and its $7.00 duck stamp exceed the maximums set by the legislature. There is also a conflict in that deer hunters are to be charged $25.00 by the commission and $10.50 under the act. In its complaint, the commission alleged that the legislature's attempt to set maximum prices on anything other than the basic resident hunting and fishing licenses was an unconstitutional infringement on the commission's power.

The chancellor ruled that the legislature has the power to set the resident license fees, but that the authority to issue special licenses or permits is vested in the commission. So he approved the basic hunting and fishing license fees of $10.50 and at the same time upheld the sportsman's permit of $25.00. He ruled that the legislature's attempt to set other maximum fees in Act 939 and Act 1 is unconstitutional.

The dispute between the legislature and the commission is a disagreement over what Amendment 35 means. First, the amendment specifically says the legislature can raise the fee for resident hunting and fishing licenses. Section 8 reads in part:

> Resident hunting and fishing license, each, shall be One and 50/100 Dollars annually, and shall not exceed this amount unless a higher license fee is authorized by an Act of Legislature.

Immediately following that provision is a paragraph which reads:

> The Commission shall have the exclusive power and authority to issue licenses and permits, to regulate bag limits and the manner of taking game and fish and furbearing animals . . . .

Amendment 35 cannot mean that both the legislature and the commission have the right to set maximum charges for resident hunting and fishing licenses. We cannot have the legislature saying a resident hunting license for hunting deer costs $10.50 and the commission saying it costs $25.00. Amendment 35 clearly meant to give the legislature the power to determine the cost to an Arkansas resident for the privilege of

hunting and fishing.

While the legislature has that power, we have strictly limited it. In the case of *State ex rel. Wright* v. *Casey*, 225 Ark. 149, 279 S.W.2d 819 (1955), the question was who had the right to set the license fee for fox hunting dogs, the commission or the legislature. We held the commission had that power, at the same time recognizing that resident hunting and fishing license fees are the province of the legislature.

In *Smith* v. *McNair*, 231 Ark. 49, 328 S.W.2d 262 (1959), we struck down a legislative act which gave persons over the age of 65 free hunting and fishing licenses. Again, we strictly construed the language of Amendment 35 and held that while the legislature could increase the price of a resident hunting or fishing license, it could not say who might be entitled to free licenses.

In *Arkansas Game & Fish Commission* v. *Edgmon, supra,* we struck down a law which directed disbursement of money from the Game and Fish fund to pay bounties on wolves.

All of these decisions limit the legislature to the express grant of power in Amendment 35. Using that same standard for the commission, we hold it cannot intrude on the legislature's clear prerogative to set the fees in question. The commission can issue licenses and permits for residents so long as their cost does not exceed the maximum set by the legislature. Amendment 35 does not say the legislature can set only one fee for all game or fish. If the fee set by the commission for any resident hunting or fishing license or permit conflicts with the power of the legislature, then the commission's action must yield. Both cannot set maximum fees for a resident to hunt and fish in Arkansas.

We hold § 18 of Act 939 as amended by Act 1 is constitutional.[2] So the chancellor's decree is reversed in this regard.

---

[2] The issue here is, of course, *resident* hunting and fishing license fees. The parties concede the commission has historically set the prices for nonresident hunting and fishing licenses.

*REVIEW AND ADVICE*

Finally, we come to the Legislative Council's "review and advice" provision in Act 939 § 17, which reads:

> The agency, board, commission, department or institution to whom funds are appropriated by this Act shall not enter into any contract for any professional or consultant services which shall extend for more than twenty (20) actual working days or the total compensation exceeds five thousand dollars ($5,000) during any one fiscal year without first seeking the advice of the Arkansas Legislative Council. Provided further, that all contracts for professional or consultant services shall be submitted monthly to the Chief Fiscal Officer of the State for reporting to the Legislative Council.

The Legislative Council was created because the General Assembly only meets regularly 60 days every two years. It is composed of 36 members of the senate and house and makes recommendations to the legislature. The council holds hearings on legislative matters when the legislature is not in session — which is most of the time. It reviews all budget requests of state agencies before the legislative session. *See* Powers, *Separation of Powers; The Unconstitutionality of the Arkansas Legislative Council*, 36 Ark. L. Rev. 124 (1982).

According to Representative Miller, a Review and Advice Committee was set up by the Legislative Council to advise state agencies on the intent of legislative appropriations and to let the legislature know whether its intent was being carried out. When the agency submits a contract, as required under the act, the committee hears the request and stamps it favorable or unfavorable. Representative Miller testified that what happened after approval or disapproval was up to the executive body and that the legislature was merely acting in an advisory capacity.

Steve Wilson testified that the commission felt limited by the review and advice practice and considered it tantamount to a request for approval of the contract.

John Hale, an administrator in the Department of Finance and Administration, testified that since 1977 it had been his policy to automatically disapprove any contract that the legisla-

tive council did not favor.

The chancellor found that the practice on its face and in application to the commission was constitutional. He said the testimony of John Hale was persuasive but he did not find the legislative practice to be the equivalent of approval or consent. We disagree and find that it violates the separation of powers doctrine.

Despite Representative Miller's testimony that the committee is merely "advising" an agency to act, the proof of the pudding is in the eating. In this case the eating is how that "advice" is treated. Since 1977 the Department of Finance and Administration has disapproved any request that the committee stamped unfavorable. The effect of the "advice" is simply a veto of executive actions by the legislature.

It is unreasonable to expect any state agency to defy such a body that has the power to determine its well-being. *See* Powers, *Separation of Powers; The Unconstitutionality of the Arkansas Legislative Council, supra.* The "advice" offered by the committee to an agency is tantamount to a legislative order on how to execute a contract.

The Arkansas Constitution contains explicit separation of powers provisions which declare that one branch cannot exercise any power belonging to another branch. Ark. Const. art. 4, §§ 1 and 2. *See also Wells* v. *Riviere,* 269 Ark. 156, 599 S.W.2d 375 (1980). Colorado dealt with a similar situation in *Anderson* v. *Lamm,* 195 Colo. 437, 579 P.2d 620 (1978). An executive agency was requested to get "approval" by the Joint Budget Committee before spending money which had been appropriated. The court said:

> "[T]he legislature may not attach conditions to a general appropriation bill which purport to reserve to the legislature powers of close supervision that are essentially executive in character. We are confronted with such a legislative encroachment on the executive in the present case with respect to appropriations that are conditioned upon certain reports to or approval from the general assembly's Joint Budget Committee.

An unconstitutional encroachment may not always take the form of outright invasion. A subtle coercion exercised by a powerful branch of government can effectively tie the hands of a coordinate branch. The executive authority should be free, not only from blatant usurpation of its powers, but from paralyzing interference as well. The legislature cannot hold the executive branch hostage to its will. While it can and should hold hearings and investigate at length the performance of state agencies, it cannot intrude on the prerogatives of the executive branch of government.

We reverse the chancellor's ruling and hold that § 17 of Act 939 is unconstitutional.

We do not reach the question, raised in the commission's brief, of whether substantive riders can be attached to appropriation bills. It was not argued below. *Horne Bros. Inc.* v. *Ray Lewis Corp.*, 292 Ark. 477, 731 S.W.2d 190 (1987).

The decree is affirmed in part and reversed and remanded in part with directions to enter a decree accordingly.

Affirmed in part. Reversed and remanded in part.

HAYS, J., concurs in part and dissents in part.

STEELE HAYS, Justice, concurring in part and dissenting in part. I agree with the majority opinion as to point I, in affirming the chancellor's ruling that the legislature's restriction limiting the amount of money the Game and Fish Commission may spend on its magazine violates the separation of powers doctrine and Amendment 35. I also agree as to point III, holding the review and advice section of Act 939 unconstitutional. However, I must respectfully dissent as to point II, the constitutionality of Section 18 of Act 939.

The majority opinion characterizes the question confronting the court under § 18 of Act 939 as the simple question of whether the legislature has the power to set the maximum license fees for residents to hunt and fish. The majority answers "yes." But there is much more to the conflict under § 18 of Act 939 than simply setting the prices for hunting and fishing licenses. What is at stake strikes at the heart of the Game and Fish Commission's constitutionally delegated duty to "control, manage, restore, conserve

and regulate" the birds, fish, game and wildlife resources of this State.

Amendment 35 clearly provides that the maximum resident hunting and fishing license fees shall be set by the legislature.

> Resident hunting and fishing license, each, shall be One and 50/100 Dollars annually, and shall not exceed this amount unless a higher license fee is authorized by an Act of Legislature.

But in the very next paragraph Amendment 35 grants the *exclusive* power to issue licenses and permits to the Game and Fish Commission.

> The Commission shall have the exclusive power and authority to issue licenses and permits, to regulate bag limits and the manner of taking game and fish and furbearing animals, and shall have the authority to divide the State into zones, and regulate seasons and manner of taking game, and fish and furbearing animals therein, and fix penalties for violations.

The legislature has, I believe, exceeded its constitutionally delegated duty to set maximum fees, and encroached on the power granted to the Commission to "issue" licenses under § 18 of Act 939 by creating categories of special licenses for turkey, bear, and elk. The legislature authorized the issuance of a limited number of special licenses in addition to the resident hunting and fishing license. Such virtual issuance violates Amendment 35. Furthermore § 18(G) of Act 939 states that "this Act shall be the only license or permit fees that the Game and Fish Commission may charge a resident for the privilege of hunting and fishing in this State." Yet, Amendment 35 reserved the exclusive power *to issue licenses* to the Game and Fish Commission.

The power to issue licenses and permits is located in the same paragraph which gives the Commission the authority to regulate bag limits, to regulate the manner of taking game and fish and furbearing animals, to divide the State into zones, to regulate the seasons, and to fix the penalties for violations. All the enumerated exclusive powers granted to the Commission deal with their powers of regulation, conservation, and management of our fish and game resources. Therefore, the power to issue licenses and

permits was clearly viewed by this statute as another method of controlling and stocking our game population. Although the licenses and permits are admittedly a part of the revenue raising scheme, their primary purpose is inextricably related to game and fish management.

In fact, the court recognized the regulatory nature of licenses in *State, Ex. Rel. Wright* v. *Casey*, 225 Ark. 149, 279 S.W.2d 819 (1955), upholding the Commission's authority to require a dog license fee of $1.50 for hunting foxes. The court recognized the Commission's broad authority to adopt rules and regulations for the conservation and regulation of wildlife in Arkansas, including establishing license fees which conflicted with those fees set by the legislature. In looking at Amendment 35, Sections 1 and 8 the court held:

> Under these provisions of the amendment we hold that the Commission has been given full and complete administrative power and authority to promulgate rules and regulations necessary for the conservation and preservation of all wildlife including not only the power to establish a bag limit, set seasons in which to hunt and fish and the penalty for violations but also the power to levy a license fee on all hunting dogs, just so long as such license fees are not unreasonable or arbitrary and are for regulatory purposes—as appears here—and not revenue . . . Obviously the people by enacting this amendment intended that the Commission should have sufficient and ample funds with which to function in preserving and propagating wildlife in the manner provided therein.

The *Casey* case illustrates the court's recognition that the licensing and permit process of the Commission directly relates to their powers of management and control of game resources. Although arguably in that case the facts of issuing a dog license relate more closely to the manner of taking game, the court nevertheless examined Sections 1 and 8 of Amendment 35 and upheld the regulatory nature of the license and permit structure of the Commission.

The fallacy in the majority's reasoning, as I view it, lies in defining license fees as a purely revenue raising matter. This belief leads the majority to the conclusion that the resident

hunting and fishing license should include all permits and stamps for each particular species for which the legislature would then establish the maximum fee *in toto*. What this rationale ignores is the management function of the special licenses and stamps. Such licenses and stamps allow the Game and Fish Commission flexibility in controlling and stocking the game resources of this State.

Those parts of § 18 of Act 939 setting the maximum fee on the annual resident hunting and fishing licenses at $10.50 each, I regard as constitutional. However, those sections of Act 939 allowing the legislature to issue special licenses and permits are unconstitutional in light of the express language in Amendment 35 granting the exclusive power to issue licenses and permits to the Game and Fish Commission.