Mr. Michael R. Hipp, Director Arkansas Department of Computer Services P.O. Box 3155 Little Rock, Arkansas 72203
Dear Mr. Hipp:
This is in response to your request for an opinion on six questions concerning a proposed financing plan by the Department of Computer Services ("DCS") which would be undertaken to provide the Benton Services Center ("BSC") (a division of the Department of Human Services), with a new $500,000 phone system. You note that the BSC has made a "number of unsuccessful attempts to secure capital improvement funds for this purpose," and is now requesting that DCS provide them with telephone service and install a cabling infrastructure system. The proposal would entail DCS outlaying the initial cost of the equipment, with the BSC paying a monthly fee for the overall services, a portion of which would repay DCS for the capital outlay on an amortized basis. You note that the BSC believes they have sufficient "operating funds" to provide the monthly payments to DCS. You have posed six questions relative to these facts:
 1. Is it legal for DCS to offer time payments as a means to recover inherent capital costs that are a necessary part of providing service and facilities to BSC?
 2. Is it legal for DCS to charge a nominal fee (similar to an interest rate) in return for offering time payments?
 3. Is it legal for DCS to utilize funds from the Computer Service Reserve Fund to purchase facilities that will be utilized in providing service to a single agency (rather than the state as a whole) with BSC replenishing those Reserve Funds over time?
 4. Is it legal for DCS to utilize funds from the Computer Services Revolving Fund to purchase facilities that will be utilized in providing service to a single agency (rather than the state as a whole) with BSC replenishing those Revolving Funds over time?
 5. Could this process of utilizing DCS funds to acquire facilities as a part of providing service to BSC be seen as circumventing the appropriations process (considering that BSC must have appropriated operating funds with which to make monthly payments for the service)?
 6. In order to pay DCS, is it allowable for BSC to sign an inter-agency agreement that will cross a biennium boundary?
It is my opinion, after a review of the relevant statutes and acts, that the proposal outlined above is in all likelihood not authorized by Arkansas law.
It is necessary to set out some background information prior to answering your six specific questions. The Department of Computer Services is created and governed under A.C.A. §§ 25-4-101 to -120 (Repl. 1992). The Department was created, in part, to operate a central data processing system and a central telephone service to meet the needs of state agencies and to conduct advanced and current planning for state agency data processing and telecommunications. A.C.A. § 25-4-104. The DCS is authorized to provide "services" to state agencies and to charge monthly fees for such services. A.C.A. §§ 25-4-106, -111, and -120. The subchapter provides that no state agency shall acquire any new or additional data processing or telecommunication equipment or services, expand any such equipment or services, or enter into any contract for such services, without the approval of the Director of DCS. A.C.A. § 25-4-107.[1] If the Director determines that the agency needs new, additional, or expanded data processing or telecommunications equipment or services, he may: 1) authorize the agency to acquire the requested equipment or services; 2) modify the request; 3) notify the agency of central facilities to provide the service; or 4) recommend that the services be provided through some other state agency. A.C.A. § 25-4-108(e).
I should note as an initial matter that there is no one statute or act which directly addresses the questions you pose. The answers to most of your questions must be extrapolated from a review of the entire statutory scheme and relevant appropriation acts.
In response to your first question, it is my opinion, after a review of A.C.A. §§ 25-4-101- to 120 as a whole, that the subchapter does not contemplate DCS offering time payments as a means to recover the inherent capital costs of providing equipment to a particular state agency. In my opinion, rather, the subchapter contemplates the Director's approval of equipment purchases, but then leaves it up to the relevant state agency to make the capital outlay for its own equipment. The agency may contract with DCS for services related to the equipment, and pay a monthly fee for such services, but in my opinion the subchapter does not authorize DCS to act as a financier of the capital costs of equipment for one state agency, particularly where the capital outlay is sizable in nature and where the agency has been unsuccessful in securing appropriated funds to finance the purchase.
It is my opinion that a similar conclusion obtains with regard to your second question, regarding the charging of a "fee" or interest rate in return for the offering of time payments. There is no mention in the legislation creating and empowering DCS of such fees or interest payments. In fact the subchapter contains a provision which requires DCS, at the end of each fiscal year, to compute the total expenses it incurs in providing services to state agencies, and to compare that figure with the total amounts billed and paid by the various users of the services. Any surplus of receipts over expenditures are credited pro rata to the state agency users. See A.C.A. § 25-4-120. The existence of this provision would seem to cut against the contention that DCS could factor an interest component into the services charges levied against an agency.
Your third question concerns the proposed use of the "Computer Services Reserve Fund" to fund the initial outlay for the telephone system. This fund is created at A.C.A. § 25-4-119, and is comprised of five percent of the gross billings received by the department per fiscal year. A.C.A. §25-4-118.[2] The relevant statute states that this "reserve for equipment acquisition shall be used exclusively for major equipment acquisitions or improvements of telecommunications or data processing and related support equipment including hardware and software required in order to fulfill the service requirements for user agencies." A.C.A. §25-4-118(a)(3). Although the language of this provision does not clearly prohibit the acquisition of equipment for one agency, it appears from the references to "major equipment acquisitions" and "user agencies" to be focused upon equipment necessary to provide the central services operated by DCS, as opposed to a singular equipment purchase on behalf of a state agency. In any event, because the authority of DCS to engage in such financial undertakings is questionable under its enabling legislation, the particular source of the funds available to DCS (whether from the Reserve Fund or some other fund) would also be questionable.
A similar result obtains with regard to your fourth question involving the Computer Services Revolving Fund, which is created at A.C.A. §25-4-117, and comprised of "nonrevenue receipts derived from services provided to various agencies of the federal, state, city and county governments. . . ." A.C.A. § 25-4-117(c). The Revolving Fund "shall be used for personal services, maintenance, operation, and improvement of only those activities or programs of the Department of Computer Services which are responsible for providing the service from which the revenues are derived." A.C.A. § 25-4-117(b). The question of whether this language is broad enough to include the purchase of a telephone system for one particular agency may depend upon all the facts surrounding the type of phone system purchased and the extent of DCS's continuing responsibility in regard thereto. Again, however, if the subchapter creating and empowering DCS does not contemplate it taking part in such financing arrangements, it would appear to be prohibited notwithstanding the source of the funds used by DCS.
Your fifth question, concerning whether the proposed financial transaction "could . . . be seen as circumventing the appropriations process" is particularly problematic in light of: 1) the failure of BSC to "secure capital improvement funds" for the new phone system; 2) the very specific current appropriations acts passed with regard to BSC, and 3) the existence of the "Arkansas Communications Study Committee" created at A.C.A. § 10-3-1201. I assume that your statement regarding the failure of the BSC to obtain capital improvements moneys indicates that the General Assembly has been unwilling to appropriate money for the specific purpose of acquiring the new phone system. This fact is reflected in the appropriations made for BSC. See Acts 1198 of 1995, Section 51, appropriating no moneys for capital outlay or data processing for BSC; Acts 973 of 1995, Section 2 (appropriating $40,000 and $75,000 for replacement and repair of an underground gas storage tank and a roof of one building at BSC respectively, but no money for phone systems); Acts 309 of 1995, appropriating $30,000 for repair of another roof at BSC; andgenerally Acts 1316 of 1995, Section 3. In addition, the Arkansas Communications Study Committee is charged with the duty to "advise" with the Director of the Department of Computer Services in the review of existing communications equipment, and with respect to proposed expansions, additions, or improvements to new "computer systems," which term is defined as including telephone systems. See A.C.A. §§10-3-1203(a)(1)(B)(i); (a)(1)(C) and (a)(2). Although the Arkansas Supreme Court has held the practice of legislative "advice" impermissible where it amounts to a required approval or consent of an executive agency's actions (at least in some instances, see Chaffin v. ArkansasGame and Fish Commission, 296 Ark. 431, 757 S.W.2d 950 (1988)), you, as Director of the Department of Computer Services are nonetheless bound by A.C.A. § 10-3-1203 to seek the input of the Committee prior to making your judgment in this matter. In addition, the Committee is to advise with the Governor in any appeal of your decision. See A.C.A. § 25-4-115.
Most importantly, however, in assessing whether the proposed financing transaction would violate the appropriations process, is the fact that the BSC has not received a current appropriation for capital outlay or data processing. Section 25-4-108 of the Department of Computer Services legislation requires "all state agencies [to] . . . strictly comply with the provisions of the . . . General Accounting and Budgetary Procedures Law . . . in the acquisition, [or] purchase . . . of telecommunications equipment, machinery, systems, and services." Section 19-4-520 of the General Accounting and Budgetary Procedures Law provides for the classification of appropriations into the various categories such as "personal services," "maintenance and general operation" etc. Under the classification "maintenance and general operation" are the subclassifications of "operating expenses," "capital outlay" and "data processing." A.C.A. § 19-4-522. Although a permissible expenditure under the heading "operating expenses" is "postage, telephone, and telegraph," it appears that an expenditure for the acquisition of an entire telephone system, as described in your request, would more property fall under the subclassification of "capital outlay," which is defined as including, among other things, "equipment, furniture, and fixtures." Cf. Wells v.Heath, 274 Ark. 45, 622 S.W.2d 163 (1981).[3] Because BSC was not appropriated any moneys for "capital outlay," it appears that an expenditure of funds from its "operating expenses" for such a large equipment purchase would be unauthorized. This is true at least where the expenditure is made in part toward capitalization of the equipment, as is apparently contemplated by your request. Cf., however, A.C.A. §19-4-522(d)(1)(N) (authorizing payment for "equipment not capitalized" from "operating expenses").
The resolution of your sixth and final question will depend upon the facts surrounding a particular agreement. The issue of lease-purchase agreements which "cross a biennium boundary" is discussed at length in Op. Att'y Gen. 94-100. Suffice it to say that the issue is complicated and fact intensive in each instance. I have enclosed Opinion 94-100 for your review, but in light of the negative conclusions reached above, I do not determine it necessary to explore the issue raised by your sixth question fully herein.
The foregoing opinion, which I hereby approve, was prepared by Deputy Attorney General Elana C. Wills.
Sincerely,
WINSTON BRYANT Attorney General
WB:ECW/cyh
[1] The Director's decision may be appealed to the Governor under A.C.A. § 25-4-115.
[2] The Fund may also contain loan moneys from the Budget Stabilization Trust Fund, if necessary. See A.C.A. § 25-4-118 (a)(2).
[3] In Wells, the Arkansas Supreme Court upheld, as meeting the specificity requirements of the Arkansas Constitution, an expenditure of funds by the Department of Correction for printing and duplicating equipment from the line item appropriation for "maintenance and general operation." In the relevant appropriation act in Wells, however (Act 368 of 1975), the appropriation only mentioned and set an appropriated amount for the broad classification of "maintenance and general operation" and did not subclassify the appropriation into "capital outlay" and "operating expenses" as is done in the appropriation act relevant to BSC. See Act 1198 of 1995, § 51.