The Honorable Mike Beebe State Senator 211 W. Arch Avenue Searcy, Arkansas 72143-5331
Dear Senator Beebe:
I am writing in response to your request for my opinion on the significance of the Arkansas Supreme Court's ruling in Lake View SchoolDistrict No. 25 v. Huckabee, 340 Ark. 481, 10 S.W.3d 892 (2000), specifically with respect to the issue of the state's waiving sovereign immunity by engaging in settlement negotiations. You have also posed the following question:
 [U]nder the Court's ruling in that case, are we now faced with a proposition that all settlement negotiations of whatsoever kind by either side [in] any civil or criminal case are admissible against the party making the settlement offers, and if so, what kind of chilling effect will this have on our ability to resolve litigation short of trial?
To expedite my analysis, I will break your request down into three related questions:
 1. What effect does the opinion in Lake View have on the question of when and how the state might waive its sovereign immunity?
 2. Assuming the state has waived sovereign immunity, will the substance of failed settlement negotiations be admissible against either or both of the parties at trial?
 3. What effect will the Supreme Court's decision in Lake View have on the state's ability to resolve litigation short of trial?
RESPONSE
In response to your first question, it appears that the state might risk waiving sovereign immunity if it publicly acknowledges state monetary liability in the course of and following unsuccessful class-action settlement negotiations. However, Lake View is a confusing opinion, and it is difficult to tell if the case has broader implications. With respect to your second question, Lake View might be read as establishing that, at least in class actions, the state cannot invoke the protection of Ark. R. Evid. 408, which declares that representations made in the course of settlement negotiations are inadmissible to establish either the fact or the extent of liability. However, the complicated factual and procedural background of this case, as well as the Court's reticence in the decision itself, makes it difficult to draw any certain conclusions. Although Lake View does not directly address whether a private litigant's positions in settlement negotiations might be used against him as admissions, the case has proceeded as though only the state is bound by the representations contained in the rejected agreed order of settlement. Finally, I believe elements of the ruling in Lake View might discourage the state from provisionally stipulating to liability — or, for that matter, anything else — in the course of publicized class-action settlement negotiations. However, Lake View strikes me as an anomalous case in many respects, and I doubt it will significantly affect the state's ability to settle anything other than highly publicized class-action lawsuits. Moreover, I believe that the General Assembly is empowered to address and resolve any evidentiary and jurisdictional-immunity concerns raised by Lake View.
Question 1: What effect does the opinion in Lake View have on thequestion of when and how the state might waive its sovereign immunity?
The relationship between participating in settlement negotiations and waiving sovereign immunity has been addressed most recently in Milberg,Weiss, Bershad, Hynes, and Lerach, LLP et al. v. State, 342 Ark. ___, ___ S.W.3d ___, 2000 WL 1512729 (Ark. Oct 12, 2000) (NO. 99-1458), the class action tobacco litigation. In Milberg, Weiss, the state settled its claims by consent decree against the defendant tobacco companies. The appellant/attorneys, who claimed to have represented the class plaintiffs on behalf of the state, argued that the chancellor erred in ruling that the state had not waived its sovereign immunity defense against the appellants' claims for attorneys' fees in chancery court. The Supreme Court affirmed the chancellor's decision on this point. 2000 WL 1512729, at 10.
The Supreme Court's reasoning in reaching its conclusion bears some analysis. The Court began by offering the following familiar — but, as I will discuss below, by no means invariable — formulation regarding sovereign immunity:
 Sovereign immunity is jurisdictional immunity from suit. State Office of Child Support Enforcem't v. Mitchell, 330 Ark. 338, 954 S.W.2d 907
(1997). This defense arises from Article 5, § 20, of the Arkansas Constitution, which provides: "The State of Arkansas shall never be made a defendant in any of her courts." This court has consistently interpreted this constitutional provision as a general prohibition against awards of money damages in lawsuits against the state and its institutions. See, e.g., Cross v. Arkansas Livestock Poultry Comm'n, 328 Ark. 255, 943 S.W.2d 230 (1997); Fireman's Ins. Co., 301 Ark. 451, 784 S.W.2d 771. The doctrine of sovereign immunity is rigid and may only be waived in limited circumstances. Mitchell, 330 Ark. 338, 954 S.W.2d 907. This court has recognized only two ways in which a claim of sovereign immunity may be surmounted: (1) where the state is the moving party seeking specific relief; and (2) where an act of the legislature has created a specific waiver of immunity. Id.
Id. See also Ark. Op. Att'y Gen. No. 97-013 ("The [state] can invoke sovereign immunity in any court proceeding in which it has not voluntarily appeared and sought affirmative relief, and in any instance in which the legislature has not statutorily granted specific permission to sue the state in a court of the state.").
The Court then offered several reasons why the state had not waived sovereign immunity in Milberg, Weiss. First, it noted that the appellants had never been given leave to intervene in the chancery court action, and that their claim consequently could not be characterized as a "counterclaim or offset" of the sort that might defeat sovereign immunity. 2000 WL 1512729, at 10. Secondly, and more to the point of your request, the Court rejected the appellants' argument that the state had waived its immunity by moving to amend the consent decree to include appellants on a negotiated list of outside counsel to be paid by the tobacco litigants. Id. at 11. The state's motion might arguably be characterized as directly related to the terms of the settlement and hence part of the settlement negotiation process. In support of their argument, the appellants invoked Lake View, in which the Court had ruled that the state waived sovereign immunity in part by conditionally agreeing in the course of settlement negotiations that it would pay plaintiffs' attorneys' fees if the proposed settlement were approved. The Court distinguished Lake View as follows:
 The state's actions in Lake View are distinguishable, in that, there, the state not only advocated the payment of attorney's fees in general, it advocated that the fees be paid from state funds. Here, however, the State advocated only that Appellants be paid attorney's fees from the tobacco companies. . . . Additionally, unlike the situation in Lake View, the State did not continue to push for attorney's fees on behalf of Appellants. To the contrary, the State withdrew its motion before any action had been taken by the chancery court. It is thus clear that the State never waived its immunity from a claim for attorney's fees to be collected from State coffers. Accordingly, our decision in Lake View does not require a reversal of the chancellor's finding that the State was entitled to the defense of sovereign immunity.
Id. at 12. The Court concluded that the appellants were limited to seeking recovery of fees directly from the state before the Arkansas State Claims Commission. Id.
With respect to the question of waiver, what is perhaps most striking about Milberg, Weiss is that in the very act of reasserting that the state can waive sovereign immunity only by legislative action or by itself seeking specific judicial relief, the Court acknowledged that the state might waive its immunity by a third route — viz., by conditionally admitting state liability in the course of settlement negotiations. Although the Court went on to conclude that no such waiver had occurred in the case before it, the question remains whether this underlying principle constitutes a major bar to negotiating the settlement of cases against the state.
As you know, Lake View is a pending class action challenging the state's formula for financing public education. After much maneuvering, the parties negotiated a proposed settlement and circulated an agreed settlement order that included a provision for attorneys' fees.340 Ark. at 489-90. In accordance with the procedures for handling proposed class-action settlements, Ark. R. Civ. P. 23, the chancery court eventually rejected the proposed settlement. 340 Ark. at 489-90. The chancery court subsequently granted the state's motion for summary judgment on grounds of sovereign immunity and denied an award of fees.Id. at 492-93. In reversing this ruling, the Supreme Court observed:
 It is axiomatic that the State of Arkansas can voluntarily waive a sovereign-immunity defense. See, e.g., Newton v. Etoch, supra
[332 Ark. 325, 965 S.W.2d 96 (1998)]; State of Arkansas Office of Child Support Enforcement v. Mitchell, 330 Ark. 338, 954 S.W.2d 907 (1997); State v. Tedder, 326 Ark. 495, 932 S.W.2d 755 (1996). In addition, the State can consent to being sued. Ozark Unlimited Rehab. Coop., Inc. v. Daniels, 333 Ark. 214, 969 S.W.2d 169 (1998). We conclude that when the State of Arkansas signed off in two published notices to the class members advocating that attorneys' fees be paid and continued to push for payment of attorneys' fees even after the chancery court refused to sign the Agreed Order, it waived its sovereign-immunity defense to payment of those fees. We do understand that the State was seeking resolution of this litigation by supporting payment of those fees, but we are hard pressed to reconcile published notices to class members supporting fees and representations to the chancery court to the same effect with a later claim of immunity.
Id. at 496. The Supreme Court in Lake View thus ruled that the state can waive sovereign immunity and accede to suit solely by conduct suggesting some state liability in a particular lawsuit, even though it has not sought any affirmative relief in the lawsuit and the legislature has not expressly waived immunity. This novel proposition is unsupported by any of the cases recited in the passage just quoted.
Lake View marks the latest stage in the evolution of the Court's thinking regarding when — or, for that matter, even if — the state can waive sovereign immunity or consent to suit. At issue are various provisions of the Arkansas Constitution. First, as noted above, Ark. Const. art. V, §20 provides that the state cannot be made a defendant in her own courts. In addition, Ark. Const. art. XVI, § 2 provides that the legislature shall arrange for payment of all "just and legal debts" incurred by the state.[1] It seems to me pertinent to your request to review the Court's various pronouncements in light of these constitutional provisions, thereby providing some framework to assess the possible scope of the ruling in Lake View.
In Fireman's Insurance Company v. Arkansas State Claims Commission,301 Ark. 451, 784 S.W.2d 771 (1990), the Supreme Court considered the interplay of Ark. Const. arts. V, § 20 and XVI, § 2. The Court approvingly invoked a "long and unequivocal line of cases" establishing that "the constitutional prohibition [of suits against the state] was not merely declaratory that the state could not be sued without her consent, but that all suits against the state were expressly forbidden." Id. at 455. The Court further declared:
 The only exception to total and complete sovereign immunity from claims which has been recognized by this court occurs when the state is the moving party seeking specific relief [i.e., the plaintiff or a counterclaimant]. In that instance the state is prohibited from raising the defense of sovereign immunity as a defense to a counterclaim or offset. Parker v. Moore, 222 Ark. 811, 262 S.W.2d 891 (1953).
Id. With respect to the legislature's constitutional duty to pay all just debts, the Court stated:
 [T]he Claims Commission is an arm of the General Assembly and the General Assembly has total control over the determination of, and subsequent funding for, payment of the "just debts and obligations of the state" — all other avenues of redress through legal proceedings being barred by the sovereign immunity provision of the Arkansas Constitution. . . .
Id. at 458. See A.C.A. § 19-10-204(a) (declaring that subject to certain inapplicable exceptions, the Claims Commission has "exclusive jurisdiction over all claims against the State of Arkansas and its several agencies, departments, and institutions . . ." (emphasis added)).[2] The Court expressly pronounced this post-deprivation procedure consistent with due process. 301 Ark. at 457.
Because art XVI, § 2 charges the General Assembly with paying the state's debts, any waiver of immunity or consent to suit implicates the separation-of-powers doctrine established in Ark. Const. art. IV, § 2, which requires that the three branches of government (legislative, executive, and judicial) remain separate and distinct, and that such separation be strictly enforced. See generally, Oates v. Rogers,201 Ark. 335, 144 S.W.2d 437 (1940).[3] In the present case, assumingFireman's accurately states the law, absent a constitutional amendment authorizing the courts, rather than the legislature, to determine the state's legitimate debts, any attempt to shift this decision-making power to the state courts would appear to run afoul of Ark. Const. art. IV, §2, art. V, § 20 and art. XVI, § 2.
However, Fireman's is inconsistent with a body of divergent case law on the issue of whether sovereign immunity can be waived. As noted above,Fireman's flatly declares that the state cannot be sued in her own courts unless the suit is a counterclaim. 301 Ark. at 455. See also, Fairbanksv. Sheffield, 226 Ark. 703, 706, 292 S.W.2d 82 (1956) (declaring that sovereign immunity is a constitutional mandate that "cannot be waived by the General Assembly"); accord Arkansas State Highway Commission v.Nelson Brothers, 191 Ark. 629, 87 S.W.2d 394 (1935). The Supreme Court recently echoed this principle in Grine v. Board of Trustees,338 Ark. 791, 796-97, 2 S.W.3d 54 (1999):
 Article 5, section 20, of the State Constitution provides:" The State of Arkansas shall never be made a defendant in any of her courts." Suits against the State are expressly forbidden by this provision. Beaulieu v. Gray, 288 Ark. 395, 705 S.W.2d 880 (1986); Page v. McKinley, 196 Ark. 331, 118 S.W.2d 235 (1938). As we stated long ago in Pitcock v. State, 91 Ark. 527, 535 (1909), "[A] sovereign State cannot be sued except by its own consent; and such consent is expressly withheld by the Constitution of this State." Recently, we reiterated this express prohibition in Brown v. Arkansas State HVACR Lic. Bd., 336 Ark. 34, 984 S.W.2d 402 (1999). In Brown, we pointed out that sovereign immunity is jurisdictional immunity from suit, and where the pleadings show the action is one against the State, the trial court acquires no jurisdiction.
(Emphasis added.) However, the Court immediately qualified its pronouncement as follows:
 However, unlike subject-matter jurisdiction, sovereign immunity can be waived. Newton v. Etoch, 332 Ark. 325, 331, 965 S.W.2d 96 (1998); State v. Tedder, 326 Ark. 495, 932 S.W.2d 755 (1996); Cross v. Arkansas Livestock Poultry Comm'n, 328 Ark. 255, 943 S.W.2d 230 (1997); Department of Human Servs. v. Crunkleton, 303 Ark. 21, 791 S.W.2d 704
(1990).
Id. at 797.
The self-contradictory suggestion in Grine that an absolute constitutional mandate can be waived has become a virtual mantra in Supreme Court pronouncements on sovereign immunity, and it was predictably echoed in Lake View. 340 Ark. at 496. What sets Lake View
apart is that it verges on suggesting that participating in any way in a lawsuit, including by settlement negotiations, will amount to a waiver of sovereign immunity. In this respect, the Court's opinion is consistent with one issued only a month and four days earlier in Arkansas PublicDefender Commission v. Burnett, 340 Ark. 233, 12 S.W.3d 191, 193-94
(2000), in which the Court, after declaring that sovereign immunity will apply unless the state sues or the legislature waives immunity, noted that the state had not "entered its appearance," thus suggesting that waiver can also be effected by responsive pleading.
Given the practical complications of the case and the theoretical inconsistencies in the Court's pronouncements on sovereign immunity, it is difficult to assess what Lake View means. I believe the scope of the case should be qualified by Ark. Const. art. XVI, § 2, which charges the General Assembly with exclusive responsibility for determining and paying the state's debts. In Fireman's, the only Arkansas case squarely to address the issue, the Supreme Court declared that the legislature had "without question delegated to the Commission duties which are, under the Constitution, solely the duties of the General Assembly. . . ."301 Ark. at 458. This delegation is constitutionally unimpeachable precisely because the Claims Commission is "an arm of the General Assembly." Id.
Nevertheless, the Arkansas Supreme Court has never expressed any concern that the separation-of-powers doctrine might qualify its recent suggestions that not only the legislature by enactment, but the executive by conduct, can waive sovereign immunity. In its more recent decisions, the Court has acknowledged, without even addressing separation-of-powers issues, the concept of waiver by conduct — a notion it applied in LakeView even while echoing its own boilerplate formulas to the contrary. In the face of this apparent confusion, it is very difficult to draw conclusions. In all likelihood, Lake View should be narrowly interpreted to hold only that the state will have waived sovereign immunity if it publicly acknowledges liability in the course of negotiating a class-action settlement and reaffirms the liability even after the settlement has been rejected. I frankly fail to understand how the state's acknowledgment of liability can shift jurisdiction from the Claims Commission to a court, but that indeed seems to be the underlying premise of Lake View. However, I do not read either Lake View or Milberg,Weiss as holding that the state will have waived sovereign immunity in any variety of lawsuit simply by exploring the possibility of settlement.
Question 2: Assuming the state has waived sovereign immunity, will thesubstance of failed settlement negotiations be admissible against eitheror both of the parties at trial?
I am inclined to approach your question by addressing two distinct issues relating to class actions: first, whether the substance of a proposed class-action settlement will invariably be publicized; and second, whether any stipulations of fact contained in an agreed order that the court subsequently declines to approve will be binding on the parties in subsequent litigation. Under the Rules of Civil Procedure and Evidence, I think the answers to these questions should be "yes" and "no," respectively. Unfortunately, the Supreme Court in Lake View appears to have reached a different conclusion with respect to the latter question.
At issue is the interplay of Ark. R. Civ. P. 23 and Ark. R. Evid. 408, which is codified at A.C.A. § 16-41-101. Subsection (e) of Rule 23 provides that any compromise of a class action must be approved by the court after class members have been provided notice of the proposed settlement and an opportunity to object. Rule 408 provides that evidence of offering or accepting certain consideration in compromise of a disputed claim is not admissible to prove either liability on or the amount of a claim.[4] Rule 408 exists to promote complete candor among litigants and thereby to encourage settlements. See Missouri PacificRailroad v. Arkansas Sheriff's Boy's Ranch, 280 Ark. 53, 655 S.W.2d 389
(1983). The effect of Rule 408 is to keep the finder of fact's judgment from being influenced by a litigant's acknowledgment during settlement negotiations of potential exposure. However, the rule's purpose can be frustrated in a class action because filing and sending notice of a proposed agreed order of settlement necessarily publicizes settlement terms that the court may reject based on the response to the notice or on its own motion. In such a situation, the court is left to resolve factual disputes knowing what resolution the parties deem fair. The rejected order might even stipulate as to certain facts upon which the parties agreed solely to effect a settlement. Such a result clearly violates the spirit of Rule 408.
The scenario just recited may have been played out in Lake View. The parties negotiated and circulated an agreed order that included a provision for attorneys' fees, but the chancery court eventually rejected the proposed settlement. 340 Ark. 489-90. In my opinion, assuming these were the only relevant facts, the appropriate course under Rule 408 would have been for the court to treat everything in the agreed order as a nullity, including any waiver of sovereign immunity and any stipulation regarding the value of any "common benefit" the plaintiffs may have bestowed on the state by pursuing their action. However, the Court inLake View made no such effort to rebag the cat, instead ruling that a waiver of sovereign immunity for the limited purpose of negotiating a settlement would survive the breakdown of the settlement process. Id. at 496. Moreover, the Court very recently declared in the Milberg, Weiss
tobacco decision that the plaintiffs' pursuit of Lake View had created a "common benefit" fund of $130 million, 2000 WL 1512729, at 11 — a statement supported by its inclusion as a stipulation in the rejected agreed order. 340 Ark. at 489. These events might be read as supporting the proposition that the state will be bound by anything contained in a proposed class-action settlement agreement regardless of whether the settlement is approved. In short, it appears that Rule 23 may trump Rule 408, at least when the government is the class-action defendant.
However, the Court might not accept such a neat summary of its ruling. Significantly, the Court appears to have been struck by the particular strength and breadth of state support for the agreed order, noting that the full Legislative Council and the Governor had advocated its approval. Id. at 490. Moreover, the Court ruled that the state had waived sovereign immunity not only because it had advocated the payment of attorneys' fees in the notice to class members — an event that occurred before the court rejected the proposed agreed order — but also because it had "continued to push" for payment of fees even after the rejection.Id. at 496. In its recitation of the facts, the Court further stressed that the state had announced even after the rejection that it stood generally by the agreed order and specifically by the recitation therein that Lake View's efforts had created a $130 million fund. Id. at 490-91. Given the Court's focus on these post-rejection ratifications of the agreed order, it is unclear that it would consider anything contained in the proposed order in itself an admission.[5] Nevertheless, the Court's focus in the recited paragraph on the substance of the class notice remains significant. It may be that the Court is inclined to treat as an admission anything that has already been publicized in accordance with the procedural requirements for maintaining a class action. Perhaps the Court simply feels it would be unseemly for the state to repudiate a position it has publicly endorsed — a factor that may likewise have influenced the Court in the Johnson ruling discussed supra, at note 5.
In my opinion, the Court's ruling in Lake View may have limited application beyond this single, unusual and high-profile class action; indeed, at the conclusion of its opinion, the Court itself felt compelled to emphasize "that this is a unique case with a unique set of circumstances."[6] 340 Ark. at 497. It may be that Lake View will consequently be largely ignored in the future as sui generis — i.e., as a case in which a unique set of circumstances prompted a somewhat result-oriented decision. I strongly doubt the Court would extend its ruling to cover the substance of settlement negotiations in any other type of civil or criminal litigation. Rule 408 has a long and noble history, and I suspect it was tacitly ignored in this instance both because Rule 23 dictated public disclosure and because the state proved disturbingly eager to ratify representations initially offered only on condition of settlement. The Court's holding in Lake View consequently appears limited in its application.
Finally, it does not appear that the Court would apply an "admissions" analysis to private class-action litigants as well as the state. In the wake of the Lake View opinion, the class-action plaintiffs have been bound by nothing contained in the agreed order of settlement, including their provisional concession that any constitutional inadequacy in the school-funding formula has been remedied. It may be that the Court simply feels a lesser need to require public consistency from a private actor or, alternatively, that it is disinclined to prejudice class members because of their counsel's conditional concessions.
Question 3: What effect will the Supreme Court's decision in Lake Viewhave on the state's ability to resolve litigation short of trial?
The answer to your question will depend, first, on the exact extent of the holding in Lake View — which, as discussed above, is difficult to determine — and, secondly, on whether the General Assembly elects to address this issue through legislation. If one were to adopt the most draconian possible interpretation of Lake View, concluding that it rendered admissible against the state the substance of any settlement negotiations, be the case civil or criminal, the General Assembly might be inclined effectively to overrule the Court by legislatively declaring the confidentiality of such information. In my opinion, any effort to do so would raise separation-of-powers concerns. The Supreme Court has stated that in case of a conflict between a legislative enactment and a Court rule, the Court "will defer to the General Assembly, when conflicts arise, only to the extent that the conflicting court rule's primary purpose and effectiveness are not compromised; otherwise, our rules remain supreme." State v. Sypult, 304 Ark. 5, 800 S.W.2d 402 (1990). However, as the Court acknowledged in Price v. Price, 341 Ark. 311, 315-16 (2000), this rule does not always apply:
 An exception to the foregoing rule exists when the statutory rule is based upon a fixed public policy which has been legislatively or constitutionally adopted and has as its basis something other than court administration. See Citizens for a Safer Carroll County v. Epley, 338 Ark. 61, 991 S.W.2d 562 (1999) (where the General Assembly's statute required a shorter appeal time than the court's procedural rule, the court held the statute controlling because it was based on the strong public policy that local option election matters should be advanced).
I should note that the Sypult rule and the Price exception may be qualified by the voters' recent approval of Ark. Const. amend. 80, which, inter alia, reorganized the court system in Arkansas. Section 9 of Amendment 80 provides that the legislature by 2/3 vote may amend or annul "[a]ny rules promulgated by the Supreme Court pursuant to Sections 5, 6(b), 7(D), or 8 of this Amendment." The referenced sections acknowledge that the Supreme Court may by its rules exercise "general superintending control" over inferior courts. However, Section 9 does not independently authorize the legislature to annul or abridge the rules referenced in Section 3 of Amendment 80, which provides:
 Rules of pleading, practice and procedure. The Supreme Court shall prescribe the rules of pleading, practice and procedure for all courts; provided these rules shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury as declared in this Constitution.
Insofar as Rule 408 is one of "practice and procedure," it thus appears it would be subject to legislative amendment or reinterpretation only in accordance with the Sypult/Price doctrine.
I assume any proposed legislation designed to "remedy" Lake View would declare two things: (1) that the state could engage in settlement negotiations without waiving sovereign immunity; and (2) that Rule 408 would apply to those negotiations. In my opinion, such legislation might well fall within the Price exception. Sovereign immunity is clearly a concept grounded in "fixed public policy," not "court administration." Moreover, it is a concept the Supreme Court has repeatedly recognized as subject solely to legislative modification. Likewise, Rule 408 reflects not so much a procedural requirement in the interests of "court administration" as a reflection of policy designed to facilitate settlements and, in the case of a government defendant, to save the public money. I consequently believe the legislature might well be constitutionally empowered to enact a law of the sort just described.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP/JHD:cyh
[1] Article XVI, § 2 might be read as complementing Ark. Const. art.II, § 13, which provides generally that "[e]very person is entitled to a certain remedy in the laws. . . ." However, in Hardin v. City of DeVallsBluff, 256 Ark. 480, 485, 508 S.W.2d 559 (1974), the Supreme Court held that the constitution does not require affording claimants "redress for asserted wrongs against counties and cities acting in their governmental capacities." By extension, it appears that article II, § 13 could not independently be read as obligating the state to provide a forum to entertain claims against it.
[2] In Hanley v. Arkansas State Claims Commission, 333 Ark. 159, 166,970 S.W.2d 198 (1998), the Court highlighted the terms "total control" and "all other avenues of redress" in quoting the recited passage fromFireman's, thus suggesting a continued policy of avoiding any waiver of sovereign immunity. The Court noted that the Claims Commission was established in 1949 precisely because sovereign immunity barred judicial resolution of claims against the state and that "all appeals of the Commission's rulings must be heard by the General Assembly, and not the courts." Id.
The constitutional proscriptions against waiving sovereign immunity may help explain why the state has regularly, if not invariably, resisted judicial determination of claims against it. As the Court noted inSolomon v. Valco, Inc., 288 Ark. 106, 107, 702 S.W.2d 6 (1986): "Exceptions to the rule prohibiting suits against the state are few." The state has traditionally waived sovereign immunity only under compulsion. For instance, the state now submits to illegal-exaction suits filed pursuant to Ark. Const. art. XVI, § 13, which expressly authorizes such suits by citizens, only because the Supreme Court has declared that this provision takes priority over Ark. Const. art. V, § 20, which dictates that the state not appear as a defendant in her own courts. SeeMassongill v. County Of Scott, 337 Ark. 281, 285, 991 S.W.2d 105 (1999) ("We have in the past recognized the evident tension between the State's sovereign immunity and the constitutional right of the people to contest an illegal exaction. Carson v. Weiss, 333 Ark. 561, 972 S.W.2d 933
(1998). We resolved that conflict in favor of the people's ability to recover funds wrongfully expended. Streight v. Ragland, 280 Ark. 206,655 S.W.2d 459 (1983)."). Similarly, the state occasionally accedes to suit as a condition of receiving crucial federal grant money. See, e.g.,Little Rock School District v. Mauney, 183 F.3d 816 (8th Cir. 1999) (receipt of grants under Individuals with Disabilities Education Act,20 U.S.C. § 1400 et seq., constituted waiver of sovereign immunity);College Savings Bank v. Florida Prepaid Postsecondary Education ExpenseBoard, 527 U.S. 686, 119 S.Ct. 2219, 2236 (1999) (Breyer, J., dissenting) (noting the coercive force of tying highway and education grants to waiver of immunity). On occasion, the state has allowed itself to be sued in other circumstances. See, e.g., the Arkansas Tax Procedure Act, A.C.A. § 26-18-406 (authorizing judicial review of a final deficiency determination made by DFA); First National Bank v. Arkansas DevelopmentFinance Authority, 44 Ark. App. 143 (1994) (defending suit against state agency). Even when the state allows suit, as when the Highway Department condemns property without first making provisions for compensation, seeArkansas State Highway Commission v. Flake, 254 Ark. 624, 495 S.W.2d 855
(1973), the Supreme Court frequently seeks to characterize the consent to suit as something other than a waiver of sovereign immunity. Hence the Court in Solomon simply declared that "[c]ondemnation cases are . . . not considered claims against the State." 288 Ark. at 108. The state is further deemed not to have waived its sovereign immunity when it is statutorily obligated to appear, as in dependency-neglect proceedings.State of Arkansas Office of Child Support Enforcement v. Mitchell,330 Ark. 338, 348, 954 S.W.2d 907 (1997).
[3] Under the classic division of powers, the legislature makes the laws and appropriates state revenues, the executive administers the law and expends the appropriations, and the judiciary interprets the law. SeeChaffin v. Arkansas Game and Fish Commission, 297 Ark. 431,757 S.W.2d 950 (1988); Federal Express Corp. v. Skelton, 265 Ark. 187,578 S.W.2d 1 (1979); Hooker v. Parkin, 235 Ark. 218,357 S.W.2d 534 (1962).
[4] Arkansas Rule of Criminal Procedure 25.4 likewise provides that, with certain limited exceptions, neither the fact nor the substance of criminal plea negotiations will be admissible in any criminal, civil or administrative proceeding.
[5] For purposes of comparison, one might consider the approach currently applied to obligatory determinations of just compensation made by the Arkansas State Highway Commission in condemnation proceedings. As the Court declared in Arkansas State Highway Commission v. Johnson,300 Ark. 454, 463, 780 S.W.2d 326 (1989):
 We conclude that when the commission is required by federal or state law to reach a determination of just compensation and to communicate that information to the landowner, the court, or third parties, it is by statutory definition more than an offer or compromise figure. While it is true that a jury or court may award more or less than the amount stated, that does not change the fact that such a statement constitutes an admission of the constitutional entitlement of the condemnee, and it should be admissible as evidence to rebut the condemnor's contentions that the condemned property is worth less than the amount stated as just compensation.
I do not believe that a term in a proposed class-action settlement should be treated as the evidentiary equivalent of "an admission of . . . constitutional entitlement."
[6] Among these circumstances might be what seems the Court's distaste that the state advocated a proposed settlement that both the trial court and, in retrospect, the Supreme Court itself felt would have ill served the class members' interests. The Court further seemed nettled that the state appeared to ratify the substance of this proposed settlement even after the trial court had rejected it, only to withdraw that ratification later. The Court's point may simply be that the state should not be permitted publicly and voluntarily to concede and then later to deny that a case had resulted in a "substantial benefit" to Arkansans. The Court has more recently found occasion again to comment on the relative effects of a defendant's conceding or disputing a "substantial benefit":
 Nor do we see recovery as appropriate under a substantial-benefit theory such as we approved in Lake View Sch. Dist. No. 25 v. Huckabee, supra. In Lake View, the State waived sovereign immunity, acknowledged that a substantial benefit in a fixed dollar amount had accrued to the State due to the attorneys' efforts, and urged the court to approve the attorney's fees. Here, the nonpaying corporations have acknowledged no benefit that resulted from the Attorneys' efforts and have never recognized the attorney's entitlement to attorney's fees. The two situations are entirely different.
Fox v. AAA U-Rent It, 341 Ark. 483, 491, 17 S.W.3d 481 (2000). This passage suggests that the Court might limit applying its new category of waiver by admission to the singular instance in which the state has conceded a public benefit that triggers a public obligation to pay attorneys' fees.